# UNITED STATES ET AL. *v.* SOUTHWESTERN CABLE CO. ET AL.

No. 363.   Argued March 12–13, 1968.—Decided June 10, 1968.*

---

*Together with No. 428, *Midwest Television, Inc., et al.* v. *Southwestern Cable Co. et al.,* also on certiorari to the same court.

*Henry Geller* argued the cause for the United States et al. With him on the briefs were *Solicitor General Griswold, Assistant Attorney General Turner, Francis X. Beytagh, Jr., Howard E. Shapiro,* and *Daniel R. Ohlbaum.*

*Ernest W. Jennes* argued the cause for petitioners in No. 428. With him on the briefs was *Charles A. Miller.*

*Arthur Scheiner* argued the cause for respondent Southwestern Cable Co. in both cases. With him on the brief were *Morton H. Wilner* and *Harold F. Reis.* *Rob-*

*ert L. Heald* argued the cause for respondents Mission Cable TV, Inc., et al. in both cases. With him on the brief were *Frank U. Fletcher, Edward F. Kenehan,* and *James P. Riley.*

*Michael Finkelstein* filed a brief for the All-Channel Television Society, as *amicus curiae,* urging reversal.

Briefs of *amici curiae,* urging affirmance, were filed by *Robert A. Marmet, Thomas W. Wilson, John D. Matthews,* and *Robert H. Young* for the Alice Cable Television Corp. et al., and by *Wayne W. Owen, Harry M. Plotkin,* and *George H. Shapiro* for the Black Hills Video Corp. et al.

MR. JUSTICE HARLAN delivered the opinion of the Court.

These cases stem from proceedings conducted by the Federal Communications Commission after requests by Midwest Television[1] for relief under §§ 74.1107[2] and

---

[1] Midwest's petition was premised upon its status as licensee of KFMB–TV, San Diego, California. It is evidently also the licensee of various other broadcasting stations. See Second Report and Order, 2 F. C. C. 2d 725, 739.

[2] 47 CFR § 74.1107 (a) provides that "[n]o CATV system operating in a community within the predicted Grade A contour of a television broadcast station in the 100 largest television markets shall extend the signal of a television broadcast station beyond the Grade B contour of that station, except upon a showing approved by the Commission that such extension would be consistent with the public interest, and specifically the establishment and healthy maintenance of television broadcast service in the area. Commission approval of a request to extend a signal in the foregoing circumstances will be granted where the Commission, after consideration of the request and all related materials in a full evidentiary hearing, determines that the requisite showing has been made. The market size shall be determined by the rating of the American Research Bureau, on the basis of the net weekly circulation for the most recent year." San Diego is the Nation's 54th largest television market. *Midwest Television, Inc.,* 11 Pike & Fischer Radio Reg. 2d 273, 276.

74.1109 [3] of the rules promulgated by the Commission for the regulation of community antenna television (CATV) systems. Midwest averred that respondents' CATV systems transmitted the signals of Los Angeles broadcasting stations into the San Diego area, and thereby had, inconsistently with the public interest, adversely affected Midwest's San Diego station.[4] Midwest sought an appropriate order limiting the carriage of such signals by respondents' systems. After consideration of the petition and of various responsive pleadings, the Commission restricted the expansion of respondents' service in areas in which they had not operated on February 15, 1966, pending hearings to be conducted on the merits of Midwest's complaints.[5] 4 F. C. C. 2d 612.

---

[3] 47 CFR § 74.1109 creates "procedures applicable to petitions for waiver of the rules, additional or different requirements and rulings on complaints or disputes." It provides that petitions for special relief "may be submitted informally, by letter, but shall be accompanied by an affidavit of service on any CATV system, station licensee, permittee, applicant, or other interested person who may be directly affected if the relief requested in the petition should be granted." 47 CFR § 74.1109 (b). Provisions are made for comments or opposition to the petition, and for rejoinders by the petitioner. 47 CFR §§ 74.1109 (d), (e). Finally, the Commission "may specify other procedures, such as oral argument, evidentiary hearing, or further written submissions directed to particular aspects, as it deems appropriate." 47 CFR § 74.1109 (f).

[4] Midwest asserted that respondents' importation of Los Angeles signals had fragmented the San Diego audience, that this would reduce the advertising revenues of local stations, and that the ultimate consequence would be to terminate or to curtail the services provided in the San Diego area by local broadcasting stations. Respondents' CATV systems now carry the signals of San Diego stations, but Midwest alleged that the quality of the signals, as they are carried by respondents, is materially degraded, and that this serves only to accentuate the fragmentation of the local audience.

[5] February 15, 1966, is the date on which grandfather rights accrued under 47 CFR § 74.1107 (d). The initial decision of the hearing examiner, issued October 3, 1967, concluded that permanent

On petitions for review, the Court of Appeals for the Ninth Circuit held that the Commission lacks authority under the Communications Act of 1934, 48 Stat. 1064, 47 U. S. C. § 151, to issue such an order.[6] 378 F. 2d 118. We granted certiorari to consider this important question of regulatory authority.[7] 389 U. S. 911. For reasons that follow, we reverse.

## I.

CATV systems receive the signals of television broadcasting stations, amplify them, transmit them by cable or microwave, and ultimately distribute them by wire to the receivers of their subscribers.[8] CATV systems

restrictions on the expansion of respondents' services were unwarranted. *Midwest Television, Inc.,* 11 Pike & Fischer Radio Reg. 2d 273. The Commission has declined to terminate its interim restrictions pending consideration by the Commission of the examiner's decision. *Midwest Television, Inc., id.,* at 721.

[6] The opinion of the Court of Appeals could be understood to hold either that the Commission may not, under the Communications Act, regulate CATV, or, more narrowly, that it may not issue the prohibitory order involved here. We take the court's opinion, in fact, to have encompassed both positions.

[7] We note that the Court of Appeals for the District of Columbia Circuit has concluded that the Communications Act permits the regulation of CATV systems. See *Buckeye Cablevision, Inc.* v. *F. C. C.,* 128 U. S. App. D. C. 262, 387 F. 2d 220.

[8] CATV systems are defined by the Commission for purposes of its rules as "any facility which . . . receives directly or indirectly over the air and amplifies or otherwise modifies the signals transmitting programs broadcast by one or more television stations and distributes such signals by wire or cable to subscribing members of the public who pay for such service, but such term shall not include (1) any such facility which serves fewer than 50 subscribers, or (2) any such facility which serves only the residents of one or more apartment dwellings under common ownership, control, or management, and commercial establishments located on the premises of such an apartment house." 47 CFR § 74.1101 (a).

characteristically do not produce their own programming,[9] and do not recompense producers or broadcasters for use of the programming which they receive and redistribute■ Unlike ordinary broadcasting stations, CATV systems commonly charge their subscribers installation and other fees.[11]

The CATV industry has grown rapidly since the establishment of the first commercial system in 1950.[12] In the late 1950's, some 50 new systems were established each year; by 1959, there were 550 "nationally known and identified" systems serving a total audience of 1,500,000 to 2,000,000 persons.[13] It has been more recently estimated that "new systems are being founded at the rate of more than one per day, and . . . subscribers . . . signed on at the rate of 15,000 per month." [14] By late 1965, it was reported that there were 1,847 operating CATV systems, that 758 others were franchised but not yet in operation, and that there were 938 applications

---

[9] There is, however, no technical reason why they may not. See Note, The Wire Mire: The FCC and CATV, 79 Harv. L. Rev. 366, 367. Indeed, the examiner was informed in this case that respondent Mission Cable TV "intends to commence program origination in the near future." *Midwest Television, Inc., supra,* at 283.

[11] The installation costs for CATV systems in 16 Connecticut communities were, for example, found to range from $31 to $147 per home. M. Seiden, An Economic Analysis of Community Antenna Television Systems and the Television Broadcasting Industry 24 (1965).

[12] CATV systems were evidently first established on a noncommercial basis in 1949. H. R. Rep. No. 1635, 89th Cong., 2d Sess., 5.

[13] CATV and TV Repeater Services, 26 F. C. C. 403, 408; Note, The Wire Mire: The FCC and CATV, *supra,* at 368.

[14] Note, The Wire Mire: The FCC and CATV, *supra,* at 368.

for additional franchises.[15]  The statistical evidence is incomplete, but, as the Commission has observed, "whatever the estimate, CATV growth is clearly explosive in nature."  Second Report and Order, 2 F. C. C. 2d 725, 738, n. 15.

CATV systems perform either or both of two functions. First, they may supplement broadcasting by facilitating satisfactory reception of local stations in adjacent areas in which such reception would not otherwise be possible; and second, they may transmit to subscribers the signals of distant stations entirely beyond the range of local antennae.  As the number and size of CATV systems have increased, their principal function has more frequently become the importation of distant signals.[16]  In 1959, only 50 systems employed microwave relays, and the maximum distance over which signals were transmitted was 300 miles; by 1964, 250 systems used microwave, and the transmission distances sometimes exceeded 665 miles.  First Report and Order, 38 F. C. C. 683, 709.  There are evidently now plans "to carry the programing of New York City independent stations by cable to . . . upstate New York, to Philadelphia, and even as far as Dayton." [17]  And see *Chan-*

---

[15] Second Report and Order, 2 F. C. C. 2d 725, 738.  The franchises are granted by state or local regulatory agencies.  It was reported in 1965 that two States, Connecticut and Nevada, regulate CATV systems, and that some 86% of the systems are subject at least to some local regulation.  Seiden, *supra,* at 44–47.  See Conn. Gen. Stat. Rev., Tit. 16, c. 289 (1958); Nev. Stat. 1967, c. 458.

[16] The term "distant signal" has been given a specialized definition by the Commission, as a signal "which is extended or received beyond the Grade B contour of that station."  47 CFR § 74.1101 (i).  The Grade B contour is a line along which good reception may be expected 90% of the time at 50% of the locations.  See 47 CFR § 73.683 (a).

[17] Note, The Wire Mire: The FCC and CATV, *supra,* at 368 (notes omitted).

*nel 9 Syracuse, Inc.* v. *F. C. C.,* 128 U. S. App. D. C. 187, 385 F. 2d 969; *Hubbard Broadcasting, Inc.* v. *F. C. C.,* 128 U. S. App. D. C. 197, 385 F. 2d 979. Thus, "while the CATV industry originated in sparsely settled areas and areas of adverse terrain . . . it is now spreading to metropolitan centers . . . ." First Report and Order, *supra,* at 709. CATV systems, formerly no more than local auxiliaries to broadcasting, promise for the future to provide a national communications system, in which signals from selected broadcasting centers would be transmitted to metropolitan areas throughout the country.[18]

The Commission has on various occasions attempted to assess the relationship between community antenna television systems and its conceded regulatory functions. In 1959, it completed an extended investigation of several auxiliary broadcasting services, including CATV. CATV and TV Repeater Services, 26 F. C. C. 403. Although it found that CATV is "related to interstate transmission," the Commission reasoned that CATV systems are neither common carriers nor broadcasters, and therefore are within neither of the principal regulatory categories created by the Communications Act. *Id.,* at 427–428. The Commission declared that it had not been given plenary authority over "any and all enterprises which happen to be connected with one of the many aspects of communications." *Id.,* at 429. It refused to premise regulation of CATV upon assertedly adverse consequences for broadcasting, because it could not "determine where the impact takes effect, although we recognize that it may well exist." *Id.,* at 431.

The Commission instead declared that it would forthwith seek appropriate legislation "to clarify the situa-

---

[18] It has thus been suggested that "a nationwide grid of wired CATV systems, interconnected by microwave frequencies and financed by subscriber fees, may one day offer a viable economic alternative to the advertiser-supported broadcast service." Levin, New Tech-

tion." *Id.*, at 438. Such legislation was introduced in the Senate in 1959,[19] favorably reported,[20] and debated on the Senate floor.[21] The bill was, however, ultimately returned to committee.[22]

Despite its inability to obtain amendatory legislation, the Commission has, since 1960, gradually asserted jurisdiction over CATV. It first placed restrictions upon the activities of common carrier microwave facilities that serve CATV systems. See *Carter Mountain Transmission Corp.*, 32 F. C. C. 459, aff'd, 321 F. 2d 359. Finally, the Commission in 1962 conducted a rule-making proceeding in which it re-evaluated the significance of CATV for its regulatory responsibilities. First Order and Report, *supra*. The proceeding was explicitly restricted to those systems that are served by microwave, but the Commission's conclusions plainly were more widely relevant. The Commission found that "the likelihood or probability of [CATV's] adverse impact upon potential and existing service has become too substantial to be dismissed." *Id.*, at 713–714. It reasoned that the importation of distant signals into the service areas of local stations necessarily creates "substantial competition" for local broadcasting. *Id.*, at 707. The Commission acknowledged that it could not "measure precisely the degree of . . . impact," but found that "CATV competition can have a substantial negative effect upon station audience and revenues . . . ." *Id.*, at 710–711.

The Commission attempted to "accommodat[e]" the

nology and the Old Regulation in Radio Spectrum Management, 56 Am. Econ. Rev. 339, 341 (Proceedings, May 1966).

[19] See S. 2653, 86th Cong., 1st Sess.

[20] S. Rep. No. 923, 86th Cong., 1st Sess.

[21] See 106 Cong. Rec. 10416–10436, 10520–10548.

[22] *Id.*, at 10547. The Commission in 1966 made additional efforts to obtain suitable modifications in the Communications Act. See n. 30, *infra*.

interests of CATV and of local broadcasting by the imposition of two rules. *Id.*, at 713. First, CATV systems were required to transmit to their subscribers the signals of any station into whose service area they have brought competing signals.[23] Second, CATV systems were forbidden to duplicate the programming of such local stations for periods of 15 days before and after a local broadcast. See generally First Report and Order, *supra*, at 719–730. These carriage and nonduplication rules were expected to "insur[e] many stations' ability to maintain themselves as their areas' outlets for highly popular network and other programs . . . ." *Id.*, at 715.

The Commission in 1965 issued additional notices of inquiry and proposed rule-making, by which it sought to determine whether all forms of CATV, including those served only by cable, could properly be regulated under the Communications Act. 1 F. C. C. 2d 453. After further hearings, the Commission held that the Act confers adequate regulatory authority over all CATV systems. Second Report and Order, *supra*, at 728–734. It promulgated revised rules, applicable both to cable and to microwave CATV systems, to govern the carriage of local signals and the nonduplication of local programming. Further, the Commission forbade the importation by CATV of distant signals into the 100 largest television markets, except insofar as such service was offered on February 15, 1966, unless the Commission has previously

---

[23] See generally First Report and Order, *supra*, at 716–719. The Commission held that a CATV system must, within the limits of its channel capacity, carry the signals of stations that place signals over the community served by the system. The stations are to be. given priority according to the strength of the signal available in the community, with the strongest signals given first priority. Exceptions are made for situations in which there would be substantial duplication or in which an independent or noncommercial station would be excluded. *Id.*, at 717.

found that it "would be consistent with the public interest," *id.*, at 782; see generally *id.*, at 781–785, "particularly the establishment and healthy maintenance of television broadcast service in the area," 47 CFR § 74.1107 (c). Finally, the Commission created "summary, nonhearing procedures" for the disposition of applications for separate or additional relief. 2 F. C. C. 2d, at 764; 47 CFR § 74.1109. Thirteen days after the Commission's adoption of the Second Report, Midwest initiated these proceedings by the submission of its petition for special relief.

## II.

We must first emphasize that questions as to the validity of the specific rules promulgated by the Commission for the regulation of CATV are not now before the Court. The issues in these cases are only two: whether the Commission has authority under the Communications Act to regulate CATV systems, and, if it has, whether it has, in addition, authority to issue the prohibitory order here in question.[24]

The Commission's authority to regulate broadcasting and other communications is derived from the Communications Act of 1934, as amended. The Act's provisions are explicitly applicable to "all interstate and foreign communication by wire or radio . . . ." 47 U. S. C. § 152 (a). The Commission's responsibilities are no more narrow: it is required to endeavor to "make available . . . to all the people of the United States a rapid, efficient, Nation-wide, and world-wide wire and radio communication service . . . ." 47 U. S. C. § 151. The

---

[24] It must also be noted that the CATV systems involved in these cases evidently do not employ microwave. We intimate no views on what differences, if any, there might be in the scope of the Commission's authority over microwave and nonmicrowave systems.

Commission was expected to serve as the "single Government agency"[25] with "unified jurisdiction"[26] and "regulatory power over all forms of electrical communication, whether by telephone, telegraph, cable, or radio."[27] It was for this purpose given "broad authority."[28] As this Court emphasized in an earlier case, the Act's terms, purposes, and history all indicate that Congress "formulated a unified and comprehensive regulatory system for the [broadcasting] industry." *F. C. C.* v. *Pottsville Broadcasting Co.*, 309 U. S. 134, 137.

Respondents do not suggest that CATV systems are not within the term "communication by wire or radio." Indeed, such communications are defined by the Act so as to encompass "the transmission of . . . signals, pictures, and sounds of all kinds," whether by radio or cable, "including all instrumentalities, facilities, apparatus, and services (among other things, the receipt, forwarding, and delivery of communications) incidental to such transmission." 47 U. S. C. §§ 153 (a), (b). These very general terms amply suffice to reach respondents' activities.

Nor can we doubt that CATV systems are engaged in interstate communication, even where, as here, the inter-

---

[25] The phrase is taken from the message to Congress from President Roosevelt, dated February 26, 1934, in which he recommended the Commission's creation. See H. R. Rep. No. 1850, 73d Cong., 2d Sess., 1.

[26] S. Rep. No. 781, 73d Cong., 2d Sess., 1.

[27] *Ibid.* The Committee also indicated that there was a "vital need" for such a commission, with jurisdiction "over all of these methods of communication." *Ibid.*

[28] The phrase is taken from President Roosevelt's message to Congress. H. R. Rep. No. 1850, *supra,* at 1. The House Committee added that "the primary purpose of this bill [is] to create such a commission armed with adequate statutory powers to regulate all forms of communication . . . ." *Id.,* at 3.

cepted signals emanate from stations located within the same State in which the CATV system operates.[29] We may take notice that television broadcasting consists in very large part of programming devised for, and distributed to, national audiences; respondents thus are ordinarily employed in the simultaneous retransmission of communications that have very often originated in other States. The stream of communication is essentially uninterrupted and properly indivisible. To categorize respondents' activities as intrastate would disregard the character of the television industry, and serve merely to prevent the national regulation that "is not only appropriate but essential to the efficient use of radio facilities." *Federal Radio Comm'n* v. *Nelson Bros. Co.,* 289 U. S. 266, 279.

Nonetheless, respondents urge that the Communications Act, properly understood, does not permit the regulation of CATV systems. First, they emphasize that the

---

[29] Respondents assert only that this "is subject to considerable question." Brief for Respondent Southwestern Cable Co. 24, n. 25. They rely chiefly upon the language of § 152 (b), which provides that nothing in the Act shall give the Commission jurisdiction over "carriers" that are engaged in interstate communication solely through physical connection, or connection by wire or radio, with the facilities of another carrier, if they are not directly or indirectly controlled by such other carrier. The terms and history of this provision, however, indicate that it was "merely a perfecting amendment" intended to "obviate any possible technical argument that the Commission may attempt to assert common-carrier jurisdiction over point-to-point communication by radio between two points within a single State . . . ." S. Rep. No. 1090, 83d Cong., 2d Sess., 1. See also H. R. Rep. No. 910, 83d Cong., 1st Sess. The Commission and the respondents are agreed, we think properly, that these CATV systems are not common carriers within the meaning of the Act. See 47 U. S. C. § 153 (h); *Frontier Broadcasting Co.* v. *Collier,* 24 F. C. C. 251; *Philadelphia Television Broadcasting Co.* v. *F. C. C.,* 123 U. S. App. D. C. 298, 359 F. 2d 282; CATV and TV Repeater Services, *supra,* at 427–428.

Commission in 1959 and again in 1966 [30] sought legislation that would have explicitly authorized such regulation, and that its efforts were unsuccessful. In the circumstances here, however, this cannot be dispositive. The Commission's requests for legislation evidently reflected in each instance both its uncertainty as to the proper width of its authority and its understandable preference for more detailed policy guidance than the Communications Act now provides.[31] We have recognized that administrative agencies should, in such situations, be encouraged to seek from Congress clarification of the pertinent statutory provisions. *Wong Yang Sung* v. *McGrath,* 339 U. S. 33, 47.

Nor can we obtain significant assistance from the various expressions of congressional opinion that followed the Commission's requests. In the first place, the views of one Congress as to the construction of a statute adopted many years before by another Congress have "very little, if any, significance." *Rainwater* v. *United States,* 356 U. S. 590, 593; *United States* v. *Price,* 361 U. S. 304, 313; *Haynes* v. *United States,* 390 U. S. 85, 87, n. 4. Further, it is far from clear that Congress believed, as it considered these requests for legislation, that the Commission did not already possess regulatory authority over CATV. In 1959, the proposed legislation was preceded by the Commission's declarations that it "did not intend to regulate CATV," and that it preferred to rec-

---

[30] See H. R. 13286, 89th Cong., 2d Sess. The bill was favorably reported by the House Committee on Interstate and Foreign Commerce, H. R. Rep. No. 1635, 89th Cong., 2d Sess., but failed to reach the floor for debate.

[31] See, for the legislation proposed in 1959, CATV and TV Repeater Services, *supra,* at 427–431, 438–439. The Commission in 1966 explicitly stated in its explanation of its proposed amendments to the Act that "we believe it highly desirable that Congress . . . confirm [the Commission's] jurisdiction and . . . establish such basic national policy as it deems appropriate." H. R. Rep. No. 1635, *supra,* at 16.

ommend the adoption of legislation that would impose specified requirements upon CATV systems.[32]   Congress may well have been more troubled by the Commission's unwillingness to regulate than by any fears that it was unable to regulate.[33]   In 1966, the Commission informed Congress that it desired legislation in order to "confirm [its] jurisdiction and to establish such basic national policy as [Congress] deems appropriate." H. R. Rep. No. 1635, 89th Cong., 2d Sess., 16.   In response, the House Committee on Interstate and Foreign Commerce said merely that it did not "either agree or disagree" with the jurisdictional conclusions of the Second Report, and that "the question of whether or not . . . the Commission has authority under present law to regulate CATV systems is for the courts to decide . . . ."   *Id.*, at 9. In these circumstances, we cannot derive from the Commission's requests for legislation anything of significant bearing on the construction question now before us.

Second, respondents urge that § 152 (a)[34] does not

---

[32] See S. Rep. No. 923, 86th Cong., 1st Sess., 5–6.

[33] Thus, the Senate Committee on Interstate and Foreign Commerce observed in its 1959 Report that although the Commission's staff had recommended that authority be asserted over CATV, the Commission had "long hesitated," and had only recently made clear "that it did not intend to regulate CATV systems in any way whatsoever." S. Rep. No. 923, *supra,* at 5. Nonetheless, it must be acknowledged that the debate on the Senate floor centered on the broad question whether the Commission should have authority to regulate CATV. See, *e. g.,* 106 Cong. Rec. 10426.

[34] 47 U. S. C. § 152 (a) provides that "[t]he provisions of this chapter shall apply to all interstate and foreign communication by wire or radio and all interstate and foreign transmission of energy by radio, which originates and/or is received within the United States, and to all persons engaged within the United States in such communication or such transmission of energy by radio, and to the licensing and regulating of all radio stations as hereinafter provided; but it shall not apply to persons engaged in wire or radio communication or transmission in the Canal Zone, or to wire or radio communication or transmission wholly within the Canal Zone."

independently confer regulatory authority upon the Commission, but instead merely prescribes the forms of communication to which the Act's other provisions may separately be made applicable. Respondents emphasize that the Commission does not contend either that CATV systems are common carriers, and thus within Title II of the Act, or that they are broadcasters, and thus within Title III. They conclude that CATV, with certain of the characteristics both of broadcasting and of common carriers, but with all of the characteristics of neither, eludes altogether the Act's grasp.

We cannot construe the Act so restrictively. Nothing in the language of § 152 (a), in the surrounding language, or in the Act's history or purposes limits the Commission's authority to those activities and forms of communication that are specifically described by the Act's other provisions. The section itself states merely that the "provisions of [the Act] shall apply to all interstate and foreign communication by wire or radio . . . ." Similarly, the legislative history indicates that the Commission was given "regulatory power over all forms of electrical communication . . . ." S. Rep. No. 781, 73d Cong., 2d Sess., 1. Certainly Congress could not in 1934 have foreseen the development of community antenna television systems, but it seems to us that it was precisely because Congress wished "to maintain, through appropriate administrative control, a grip on the dynamic aspects of radio transmission," *F. C. C.* v. *Pottsville Broadcasting Co., supra,* at 138, that it conferred upon the Commission a "unified jurisdiction" [35] and "broad authority." [36] Thus, "[u]nderlying the whole [Communications Act] is recognition of the rapidly fluctuating factors characteristic of the evolution of broadcasting

---

[35] S. Rep. No. 781, *supra,* at 1.

[36] H. R. Rep. No. 1850, *supra,* at 1.

and of the corresponding requirement that the administrative process possess sufficient flexibility to adjust itself to these factors." *F. C. C.* v. *Pottsville Broadcasting Co., supra,* at 138. Congress in 1934 acted in a field that was demonstrably "both new and dynamic," and it therefore gave the Commission "a comprehensive mandate," with "not niggardly but expansive powers." *National Broadcasting Co.* v. *United States,* 319 U. S. 190, 219. We have found no reason to believe that § 152 does not, as its terms suggest, confer regulatory authority over "all interstate . . . communication by wire or radio." [37]

Moreover, the Commission has reasonably concluded that regulatory authority over CATV is imperative if it is to perform with appropriate effectiveness certain of its other responsibilities. Congress has imposed upon the Commission the "obligation of providing a widely dispersed radio and television service," [38] with a "fair, efficient, and equitable distribution" of service among the

---

[37] Respondents argue, and the Court of Appeals evidently concluded, that the opinion of the Court in *Regents* v. *Carroll,* 338 U. S. 586, supports the inference that the Commission's authority is limited to licensees, carriers, and others specifically reached by the Act's other provisions. We find this unpersuasive. The Court in *Carroll* considered the very general contention that the Commission had been given authority "to determine the validity of contracts between licensees and others." *Id.,* at 602. It was concerned, not with the limits of the Commission's authority over a form of communication by wire or radio, but with efforts to enforce a contract that had been repudiated upon the demand of the Commission. The Court's discussion of the Commission's authority under § 303 (r), see *id.,* at 600, must be read in that context, and as thus read it cannot be controlling here.

[38] S. Rep. No. 923, *supra,* at 7. The Committee added that "Congress and the people" have no particular interest in the success of any given broadcaster, but if the failure of a station "leaves a community with inferior service," this becomes "a matter of real and immediate public concern." *Ibid.*

"several States and communities." 47 U. S. C. § 307 (b).
The Commission has, for this and other purposes, been
granted authority to allocate broadcasting zones or areas,
and to provide regulations "as it may deem necessary"
to prevent interference among the various stations. 47
U. S. C. §§ 303 (f), (h). The Commission has concluded,
and Congress has agreed, that these obligations require
for their satisfaction the creation of a system of local
broadcasting stations, such that "all communities of ap-
preciable size [will] have at least one television station
as an outlet for local self-expression." [39] In turn, the
Commission has held that an appropriate system of local
broadcasting may be created only if two subsidiary goals
are realized. First, significantly wider use must be made
of the available ultra-high-frequency channels.[40] Second,
communities must be encouraged "to launch sound and

---

[39] H. R. Rep. No. 1559, 87th Cong., 2d Sess., 3; Sixth Report and
Order, 17 Fed. Reg. 3905. And see Staff of the Senate Comm. on
Interstate and Foreign Commerce, 85th Cong., 2d Sess., The Tele-
vision Inquiry: The Problem of Television Service for Smaller Com-
munities 3–4 (Comm. Print 1959). The Senate Committee has
elsewhere stated that "[t]here should be no weakening of the Com-
mission's announced goal of local service." S. Rep. No. 923, *supra*,
at 7.

[40] The Commission has allocated 82 channels for television broad-
casting, of which 70 are in the UHF portion of the radio spectrum.
This permits a total of 681 VHF stations and 1,544 UHF sta-
tions. H. R. Rep. No. 1559, *supra*, at 2. In December 1964,
454 VHF stations were on the air, 25 permittees were not oper-
ating, and 11 applications were awaiting Commission action, leaving
63 unreserved VHF allocations available. Seiden, *supra*, 162, n. 11,
at 10. At the same time, 90 UHF stations were operating, 66 were
assigned but not operating, 52 applications were pending before the
Commission, and 1,108 allocations were still available. *Ibid.* The
Commission has concluded that, in these circumstances, "an ade-
quate national television system can be achieved" only if more of
the available UHF channels are utilized. H. R. Rep. No. 1559,
*supra*, at 4.

adequate programs to utilize the television channels now reserved for educational purposes." [41]   These subsidiary goals have received the endorsement of Congress. [42]

The Commission has reasonably found that the achievement of each of these purposes is "placed in jeopardy by the unregulated explosive growth of CATV." H. R. Rep. No. 1635, 89th Cong., 2d Sess., 7.   Although CATV may in some circumstances make possible "the realization of some of the [Commission's] most important goals," First Report and Order, *supra*, at 699, its importation of distant signals into the service areas of local stations may also "destroy or seriously degrade the service offered by a television broadcaster," *id.*, at 700, and thus ultimately deprive the public of the various benefits of a system of local broadcasting stations. [43]   In particular,

---

[41] S. Rep. No. 67, 87th Cong., 1st Sess., 8–9.  The Committee indicated that it was "of utmost importance to the Nation that a reasonable opportunity be afforded educational institutions to use television as a noncommercial educational medium." *Id.*, at 3. Similarly, the House Committee on Interstate and Foreign Commerce has concluded that educational television will "provide a much needed source of cultural and informational programing for all audiences . . . ." H. R. Rep. No. 1559, *supra*, at 3.  It is thus an essential element of "an adequate national television system." *Id.*, at 4.   See also H. R. Rep. No. 572, 90th Cong., 1st Sess.; S. Rep. No. 222, 90th Cong., 1st Sess.

[42] Legislation was adopted in 1962 to amend the Communications Act in order to require that all television receivers thereafter shipped in interstate commerce for sale or resale to the public be capable of receiving both UHF and VHF frequencies.  76 Stat. 150.  The legislation was plainly intended to assist the growth of UHF broadcasting.  See H. R. Rep. No. 1559, *supra*.  Moreover, legislation has been adopted to provide construction grants and other assistance to educational television systems.   76 Stat. 68, 81 Stat. 365.

[43] See generally Second Report and Order, *supra*, at 736–745. It is pertinent that the Senate Committee on Interstate and Foreign Commerce feared even in 1959 that the unrestricted growth of CATV would eliminate local broadcasting, and that, in turn, this would

the Commission feared that CATV might, by dividing the available audiences and revenues, significantly magnify the characteristically serious financial difficulties of UHF and educational television broadcasters.[44] The Commission acknowledged that it could not predict with

---

have four undesirable consequences: (1) the local community "would be left without the local service which is necessary if the public is to receive the maximum benefits from the television medium"; (2) the "suburban and rural areas surrounding the central community may be deprived not only of local service but of any service at all"; (3) even "the resident of the central community may be deprived of all service if he cannot afford the connection charge and monthly service fees of the CATV system"; (4) "[u]nrestrained CATV, booster, or translator operation might eventually result in large regions, or even entire States, being deprived of all local television service—or being left, at best, with nothing more than a highly limited satellite service." S. Rep. No. 923, *supra,* at 7–8. The Committee concluded that CATV competition "does have an effect on the orderly development of television." *Id.,* at 8.

[44] The Commission has found that "we are in a critical period with respect to UHF development. Most of the new UHF stations will face considerable financial obstacles." First Report and Order, *supra,* at 712. It concluded that "one general factor giving cause for serious concern," *ibid.,* was that there is "likely" to be a "severe" impact between new local stations, particularly UHF stations, and CATV systems. *Id.,* at 713. Further, the Commission believed that there was danger that CATV systems would "siphon off sufficient local financial support" for educational television, with the result that such stations would fail or not be established at all. It feared that "the loss would be keenly felt by the public." Second Report and Order, *supra,* at 761. The Commission concluded that the hazards to educational television were "sufficiently strong to warrant some special protection . . . ." *Id.,* at 762. Similarly, a recent study has found that CATV systems may have a substantial impact upon station revenues, that many stations, particularly in small markets, cannot readily afford such competition, and that in consequence a "substantial percentage of potential new station entrants, particularly UHF, are likely to be discouraged . . . ." Fisher & Ferrall, Community Antenna Television Systems and Local Television Station Audience, 80 Q. J. Econ. 227, 250.

certainty the consequences of unregulated CATV, but reasoned that its statutory responsibilities demand that it "plan in advance of foreseeable events, instead of waiting to react to them." *Id.*, at 701. We are aware that these consequences have been variously estimated,[45] but must conclude that there is substantial evidence that the Commission cannot "discharge its overall responsibilities without authority over this important aspect of television service." Staff of Senate Comm. on Interstate and Foreign Commerce, 85th Cong., 2d Sess., The Television Inquiry: The Problem of Television Service for Smaller Communities 19 (Comm. Print 1959).

The Commission has been charged with broad responsibilities for the orderly development of an appropriate system of local television broadcasting. The significance of its efforts can scarcely be exaggerated, for broadcasting is demonstrably a principal source of information and entertainment for a great part of the Nation's population. The Commission has reasonably found that the successful performance of these duties demands prompt and efficacious regulation of community antenna television systems. We have elsewhere held that we may not, "in the absence of compelling evidence that such was Congress' intention . . . prohibit administrative action imperative for the achievement of an agency's ultimate purposes." *Permian Basin Area Rate Cases*, 390 U. S.

---

[45] Compare the following. Seiden, *supra*, at 64–90; Note, The Federal Communications Commission and Regulation of CATV, 43 N. Y. U. L. Rev. 117, 133–139; Note, The Wire Mire: The FCC and CATV, *supra*, at 376–383; Fisher & Ferrall, *supra*. We note, in addition, that the dispute here is in part whether local, advertiser-supported stations are an appropriate foundation for a national system of television broadcasting. See generally Coase, The Economics of Broadcasting and Government Policy, 56 Am. Econ. Rev. 440 (May 1966); Greenberg, Wire Television and the FCC's Second Report and Order on CATV Systems, 10 J. Law & Econ. 181.

747, 780. Compare *National Broadcasting Co.* v. *United States, supra,* at 219–220; *American Trucking Assns.* v. *United States,* 344 U. S. 298, 311. There is no such evidence here, and we therefore hold that the Commission's authority over "all interstate . . . communication by wire or radio" permits the regulation of CATV systems.

There is no need here to determine in detail the limits of the Commission's authority to regulate CATV. It is enough to emphasize that the authority which we recognize today under § 152 (a) is restricted to that reasonably ancillary to the effective performance of the Commission's various responsibilities for the regulation of television broadcasting. The Commission may, for these purposes, issue "such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law," as "public convenience, interest, or necessity requires." 47 U. S. C. § 303 (r). We express no views as to the Commission's authority, if any, to regulate CATV under any other circumstances or for any other purposes.

### III.

We must next determine whether the Commission has authority under the Communications Act to issue the particular prohibitory order in question in these proceedings. In its Second Report and Order, *supra,* the Commission concluded that it should provide summary procedures for the disposition both of requests for special relief and of "complaints or disputes." *Id.,* at 764. It feared that if evidentiary hearings were in every situation mandatory they would prove "time consuming and burdensome" to the CATV systems and broadcasting stations involved. *Ibid.* The Commission considered that appropriate notice and opportunities for comment or objection must be given, and it declared that "additional procedures, such as oral argument, evidentiary

hearing, or further written submissions" would be permitted "if they appear necessary or appropriate . . . ." *Ibid.* See 47 CFR § 74.1109 (f). It was under the authority of these provisions that Midwest sought, and the Commission granted, temporary relief.

The Commission, after examination of various responsive pleadings but without prior hearings, ordered that respondents generally restrict their carriage of Los Angeles signals to areas served by them on February 15, 1966, pending hearings to determine whether the carriage of such signals into San Diego contravenes the public interest. The order does not prohibit the addition of new subscribers within areas served by respondents on February 15, 1966; it does not prevent service to other subscribers who began receiving service or who submitted an "accepted subscription request" between February 15, 1966, and the date of the Commission's order; and it does not preclude the carriage of San Diego and Tijuana, Mexico, signals to subscribers in new areas of service. 4 F. C. C. 2d 612, 624–625. The order is thus designed simply to preserve the situation as it existed at the moment of its issuance.

Respondents urge that the Commission may issue prohibitory orders only under the authority of § 312 (b), by which the Commission is empowered to issue cease-and-desist orders. We shall assume that, consistent with the requirements of § 312 (c), cease-and-desist orders are proper only after hearing or waiver of the right to hearing. Nonetheless, the requirement does not invalidate the order issued in this case, for we have concluded that the provisions of §§ 312 (b), (c) are inapplicable here. Section 312 (b) provides that a cease-and-desist order may issue only if the respondent "has violated or failed to observe" a provision of the Communications Act or a rule or regulation promulgated by the Commission under the Act's authority. Respondents here were not found

to have violated or to have failed to observe any such restriction; the question before the Commission was instead only whether an existing situation should be preserved pending a determination "whether respondents' present or planned CATV operations are consistent with the public interest and what, if any, action should be taken by the Commission." 4 F. C. C. 2d, at 626. The Commission's order was thus not, in form or function, a cease-and-desist order that must issue under §§ 312 (b), (c).[46]

The Commission has acknowledged that, in this area of rapid and significant change, there may be situations in which its generalized regulations are inadequate, and special or additional forms of relief are imperative. It has found that the present case may prove to be such a situation, and that the public interest demands "interim relief . . . limiting further expansion," pending hearings to determine appropriate Commission action. Such orders do not exceed the Commission's authority. This Court has recognized that "the administrative process [must] possess sufficient flexibility to adjust itself" to the "dynamic aspects of radio transmission," *F. C. C.* v. *Pottsville Broadcasting Co., supra,* at 138, and that it was precisely for that reason that Congress declined to "stereotyp[e] the powers of the Commission to specific details . . . ." *National Broadcasting Co.* v. *United States, supra,* at 219. And compare *American Trucking Assns.* v. *United States,* 344 U. S. 298, 311; *R. A. Holman & Co.* v. *S. E. C.,* 112 U. S. App. D. C. 43, 47–48, 299 F. 2d 127,

---

[46] Respondents urge that the legislative history of § 312 (b) indicates that the Commission may issue prohibitory orders only under, and in conformity with, that section. We find this unpersuasive. Nothing in that history suggests that the Commission was deprived of its authority, granted elsewhere in the Act, to issue orders "necessary in the execution of its functions." 47 U. S. C. § 154 (i). See also 47 U. S. C. § 303 (r).

131–132. Thus, the Commission has been explicitly authorized to issue "such orders, not inconsistent with this [Act], as may be necessary in the execution of its functions." 47 U. S. C. § 154 (i). See also 47 U. S. C. § 303 (r). In these circumstances, we hold that the Commission's order limiting further expansion of respondents' service pending appropriate hearings did not exceed or abuse its authority under the Communications Act. And there is no claim that its procedure in this respect is in any way constitutionally infirm.

The judgments of the Court of Appeals are reversed, and the cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE DOUGLAS and MR. JUSTICE MARSHALL took no part in the consideration or decision of these cases.

MR. JUSTICE WHITE, concurring in the result.

My route to reversal of the Court of Appeals is somewhat different from the Court's. Section 2 (a) of the Communications Act, 47 U. S. C. § 152 (a), says that "[t]*he provisions of this chapter* shall apply to all interstate and foreign communication by wire or radio . . . ." (Emphasis added.) I am inclined to believe that this section means that the Commission must generally base jurisdiction on other provisions of the Act. This position would not, however, require invalidation of the assertion of jurisdiction before us today. Section 301, 47 U. S. C. § 301, gives the Commission broad authority over broadcasting, and § 303, 47 U. S. C. § 303, confers authority to "[m]ake such regulations not inconsistent with law as it may deem necessary to prevent interference between stations and to carry out the provisions of this chapter" and also the authority to establish areas or zones to be served by any station. The Commission has ample

power under these provisions to prevent a Los Angeles television broadcaster from interfering with broadcasting in San Diego. For example, the Commission could stop a Los Angeles television station from owning and operating a wire CATV system which carried the station's signals into San Diego. The Commission should also be able to prevent a third party from disrupting Commission-licensed broadcasting in the San Diego market.

Even if §§ 301 and 303 in themselves furnish insufficient basis for the Commission to enjoin extraneous interference with the San Diego broadcasting scheme it has authorized, § 2 (a), *supra,* makes the provisions of the Act, including §§ 301 and 303, applicable to all wire and radio communication. Hence the Commission is authorized to regulate wire communications to implement the ends of §§ 301 and 303, and authorized as well to use its express authority over broadcasting to enforce its specific powers over common carriers by wire.