**TELERAMA, INC., Petitioner,**

v.

**UNITED STATES of America and Federal Communications Commission, Respondents.**

Storer Broadcasting Company, Intervenor,

WUAB, Inc., Intervenor.

Nos. 17311, 19644.

United States Court of Appeals
Sixth Circuit.

Dec. 23, 1969.

Joel H. Levy, Washington, D. C., for petitioner; Marcus Cohn, Paul Dobin, Washington, D. C., on brief; Cohn & Marks, Washington, D. C., of counsel.

Stuart F. Feldstein, Atty., F.C.C., Washington, D. C., for respondents; Henry Geller, Gen. Counsel, John H. Conlin, Associate Gen. Counsel, Lenore G. Ehrig, Atty., F.C.C., Richard W. McLaren, Asst. Atty, Gen., Gregory B. Hovendon, Atty., Dept. of Justice, Washington, D. C., on brief.

Victor E. Ferrall, Jr., Washington, D. C., for intervenor Storer Broadcasting Co.; Alan Y. Naftalin, Koteen & Burt, Washington, D. C., on brief; Robert G. Stachler, Taft, Stettinius & Hollister, Cincinnati, Ohio, of counsel.

Gene A. Bechtel, George H. Shapiro, Washington, D. C., on brief for intervenor WUAB, Inc.; Arent, Fox, Kintner, Plotkin & Kahn, Washington, D. C., of counsel.

Before PHILLIPS, Chief Judge and EDWARDS and PECK, Circuit Judges.

EDWARDS, Circuit Judge.

These two cases arise out of the Federal Communications Commission's determination, first made evident in 1965 and 1966, to bring the then developing community antenna television systems (CATV) within the ambit of its regulations.

In No. 17,311 Telerama seeks review of a letter from the FCC, dated April 29, 1966, advising it that the Commission's rules (47 C.F.R. §§ 74.1107–74.-1109), effective February 15, 1965, prohibited Telerama's expansion into any suburb of Cleveland, Ohio, where it had not been operating as of that date without prior approval of the FCC.

In No. 19,644 Telerama seeks review of a Commission decision, 17 F.C.C.2d 526, issued May 7, 1969, after evidentiary hearing, denying Telerama's request for authority to import distant TV signals into a number of additional suburbs of Cleveland, Ohio.

CATV systems generally employ a high tower located upon a geographic height to intercept and transmit by cable to their subscribers the signals of distant television stations which the subscribers could not otherwise receive. For some communities this provides television reception where none existed. But for many other communities, including the major TV market areas, CATV provides high quality reception of programs from distant stations in direct competition with locally licensed TV stations.

This competition became of particular importance because of a national policy adopted by Congress in 1962, 47 U.S.C. §§ 303(s) and 330 (1962), allowing the FCC to require that television sets sold in interstate commerce be able to receive ultra high frequency signals with the objective of increasing the number of TV channels and providing educational TV in the major market areas.

Beginning in 1964, present stockholders of petitioner, Telerama, Inc., began serious studies for the initiation of a CATV system designed to serve the suburban area lying south and east of the city of Cleveland, including some portion of the eastern part of Cleveland itself. Telerama, Inc., was incorporated November 12, 1964. As of April 30, 1965, over and above the time of its organizers in planning the company's future, Telerama had actually expended in out-of-pocket sums the amount of $11,226.41. It had also received its first franchise from the city of Warrensville Heights, Ohio, on April 6, 1965, and had ordered cable to wire the first portions of that city and the neighboring city of Shaker Heights.

Meantime, on April 22, 1965, the Federal Communications Commission handed down its Notice of Inquiry and Notice of Proposed Rulemaking, 1 F.C.C.2d 453 (1965). This report contained the following language—obviously ominous in its possible impact to Telerama's future:

"In order to be in a position to take definitive action, if appropriate, we specifically invite comment on whether the foregoing course of action as to applications before the Commission should be extended to the nonmicrowave CATV system in the same type of situation (e. g., through a rule which would prohibit the extension of the signal of any television station beyond its grade B contour into a community with the situation described above (par. 49), without there having been a clear and compelling showing that in the particular circumstances there is no threat to the development or maintenance of independent UHF service in the community.)" 1 F.C.C. 2d at 472.

With this warning in hand, Telerama, Inc., proceeded with its plan, which originally contemplated CATV service to all the communities in the eastern suburbs of Cleveland, totalling in population by the 1960 census 381,824 persons. Telerama's president, Creighton E. Miller, summarized the company's activities subsequent to April 22, 1965, as follows:

"Accordingly, in late Spring and early Summer of 1965, additional orders were placed with the Ohio Bell Telephone Company for cable. See letters attached as Attachment 11, dated June 22, June 28, June 30 and July 1, 1965, to J. M. Carney from Ohio Bell. On August 13, 1965, Telerama sent Ohio Bell a check for the sum of $87,-900 to cover the costs of cable to be laid in Shaker Heights, Beachwood and Euclid, Ohio. See Attachment 12.

"In May of 1965, a tower was ordered from the Rohn Manufacturing Company of Peoria, Illinois for placement in Beachwood, Ohio. Specifications for this tower called for the erection of a 350 ft. framework which was completed by October 1965. Arrangements were also made for a head-

end building at the base of the tower at a cost of approximately $7,000. During May of 1965, the electronics equipment to be placed on or at the tower, such as special antennas for each station, highly sophisticated professional television receivers for each station, a switching system and associated electronic and electrical equipment was ordered from the Jerrold Corporation of Philadelphia, Pennsylvania with a completion date of December 1, 1965. Arrangements at this time were also made with the Keeble Steeplejack Company of Cleveland, Ohio to make the necessary installations on the tower. The cost for the tower was $12,500 and the cost for the various equipment from the Jerrold Corporation was $80,000. The total overall cost, including labor for subsequent changes, amounted to $100,000 for the tower, head-end equipment and head-end building. An office building was erected in Beachwood in 1965 to house the employees and management personnel of the company. This property is leased by Telerama at a current rate of $700 per month for a ten-year term, with an option to purchase. See attachment 12A and 12B.

"By December 1, 1965, a full complement of signals was being received at the antenna tower at Beachwood and during December and January subscribers in Shaker Heights and Warrensville Heights were hooked up to the system. On February 1, 1966, Telerama began charging the subscribers and as of February 15, 1966 there were 616 subscribers residing in Warrensville Heights, Warrensville Township and Shaker Heights hooked up to the system.

"Service in the City of Euclid was not commenced prior to February 15, 1966, although a main trunk line (approximately 8 miles in length) from the tower in Beachwood to Euclid through the communities of Lyndhurst and Richmond Heights had been laid in 1965, and feeder cable had also been laid on the streets of Euclid prior to February 15, 1966. A franchise from the City Council of Euclid was granted to Telerama on March 7, 1966."

On February 15, 1966, the FCC gave public notice (Public Notice No. 79927) of its impending Second Report and Order, 2 F.C.C.2d 725 (1966). The notice announced the adoption of the following rule, effective February 15, 1966:

"(a) No CATV system operating within the predicted grade A contour of a television broadcast station in the 100 largest television markets shall extend the signal of a television broadcast station beyond the grade B contour of that station, except upon a showing, approved by the Commission, that such extension would be consistent with the public interest, and specifically the establishment and healthy maintenance of television broadcast service in the area. Commission approval of a request to extend a signal in the foregoing circumstances will be granted where the Commission, after consideration of the request and all related materials in a full evidentiary hearing, determines that the requisite showing has been made. The market size shall be determined by the rating of the American Research Bureau on the basis of the net weekly circulation for the most recent year." 2 F.C.C.2d at 804.

The text of the rule was included in the Second Report and Order which was printed in the Federal Register on March 17, 1966, 31 Fed.Reg. 4540.

In addition to discussing the Commission's finding of jurisdiction and the rationale underlying the same, the Second Report and Order included the following pertinent passage:

"147. *The question of grandfathering.*—On February 15, 1966, we issued a public notice giving the essence of our determination in this respect. Systems not yet in operation on February 15, 1966, and proposing to extend the service of a station beyond its grade

B contour into one of the top 100 markets will come within the scope of our major market procedure, and must make the necessary showing in an evidentiary hearing. In view of the very great desirability of avoiding the disruption stemming from action applicable to an operating system and the strong public interest considerations underlying our policy, we think good cause exists for immediate effectiveness of the major market rules upon their publication, as suggested by some of the parties. A line must be drawn as to 'grandfathering,' and we believe it appropriate to do so upon the basis of operation on the date of the public notice. A system which has gone into operation by extending signals beyond their grade B contour to subscribers in the top 100 markets for the first time after that date, would be subject of a cease-and-desist proceeding. Since we shall not 'grandfather' systems coming into operation after February 15, 1966, the effectiveness of our action, practically speaking, is geared to that date." 2 F.C.C. 2d at 784. (Footnote omitted.)

The Commission appended to its report and order a copy of its newly adopted regulations (47 C.F.R. §§ 74.1107–74.-1109) which specifically provided for procedures for the hearings and determinations referred to above.

The effect, of course, was to catch Telerama deep in the water (but considerably less than midstream) in its efforts to reach its stated goals.

Telerama and its counsel naturally read the applicable rule, including its grandfathering provision, with great interest. That provision provided as follows:

"(d) The provisions of paragraph (a) and (b) of this section shall not be applicable to any signals which were being supplied by a CATV system to its subscribers on February 15, 1966, and pursuant to a franchise (where necessary) issued on or before that date; provided, however, that any new franchise or amendment of an existing franchise after February 15, 1966, to operate or extend the operations of the CATV system in the same general area does come within the provisions of paragraphs (a) and (b) of this section; and provided further that no CATV system located in the 100 largest television markets, which was supplying to its subscribers on February 15, 1966, a signal carried beyond its grade B contour, shall extend its service to new geographical areas where the Commission, upon petition filed under § 74.1109 by a television broadcast station located in the area and after consideration of the response of the CATV system and appropriate proceedings, determine that the public interest, taking into account the considerations set forth in the second report and order in dockets Nos. 14895, 15233, and 15971, FCC 66–220, paragraphs 113–149, would be served by appropriate conditions limiting the geographical extension of the system to new areas." 47 C.F.R. § 74.1107(d).

Telerama, on advice of counsel, concluded that extension of its services into the 18 communities which it had originally planned to serve did not represent extension of service into "new geographical areas," and determined to proceed without seeking any FCC approval. On April 4, 1966, Telerama ordered 25 miles of cable in order to be able to commence service to Maple Heights, a political subdivision where it had previously had neither construction nor service. Three days later the FCC notified Telerama by wire that operations in any communities not served by it on February 15, 1966, without prior petition, hearing and order of the Commission, would subject it to a show cause order pursuant to Section 312(b) of the Communications Act. Telerama responded by letter to the Commission arguing that its activities were in the area it had always intended to serve and hence not in any "new geographical area." On April 29, 1966, the Commission advised Telerama by letter that its interpretation of "new geographical areas" was in error and

equated that phrase with "an independent municipal or governmental subdivision."

Nonetheless, Telerama did not stop its efforts to construct its cable TV facilities. Indeed, it appears that it continued to make expansion investments and commitments until August 24, 1966.

But, in place of seeking FCC permission for its operations, as required by § 74.1107(a), Telerama turned to this court with a petition to review the letter of April 29, 1966, and a motion for a temporary injunction to stay the effect of the FCC order. This court denied an ex parte stay and set the matter for prompt hearing. At the hearing Telerama through brief and the representations of its counsel disputed the right of FCC to take jurisdiction over CATV in any form, contested the adequacy of the administrative procedures by which the FCC had adopted §§ 74.1101–74.1109, disputed the FCC's interpretation of § 74.1107, and claimed that the FCC's letter of April 29, 1966, as applied to Telerama, would occasion irreparable damage by depriving it in toto and finally of its claimed investment of $800,000 in its CATV facilities in the vicinity of Cleveland.

While counsel for FCC was prepared to defend FCC's jurisdiction, its procedure and its interpretation of its rule, in the absence of an evidentiary record, Telerama's equitable arguments were questioned but not rebutted.

This court thereupon decided to order a prompt evidentiary hearing on the controversy and to seek as nearly as possible to preserve the status quo of the parties in the interim. To this effect it entered an order on November 23, 1966, which provided in part:

"Having noted that petitioner asserts, and respondents do not deny, that it had performed substantial work in said city of Euclid toward the completion of its CATV distribution system prior to April 29, 1966, and had also completed substantial portions of said work prior to February 15, 1966,[1] in that 1) with respect to the Euclid area the master cable was extended almost eight miles from Beachwood, and the Euclid area was partially wired before February 15, 1966, and 2) that petitioner sought and obtained a franchise from the city authorities in Euclid for its CATV operations on March 14, 1966, prior to the date of the letter order here in dispute;

"And further, this court viewing such facts as establishing a showing of irreparable damage occurring to petitioner absent some relief, and as establishing a substantial likelihood that in this aspect of his petition petitioner may prevail on the merits of his petition for review;

"Now, therefore, in the interest of the preservation of the status quo between the parties as nearly as may be achieved under the complex facts of this situation, this court does hereby vacate its prior denial of injunctive relief entered on July 22, 1966, and hereby grants said petition for interlocutory relief *pendente lite*, thereby restraining the effectiveness of respondent's order of April 29, 1966, said stay, however, being specifically restricted in its effectiveness to petitioner's operations within said city of Euclid and said stay being contingent upon petitioner's prompt filing and processing of applications for Federal Communications Commission's approval of petitioner's existing or proposed CATV operations in the cities of Euclid, Mapleheights and Beachwood (and any others it chooses); * * * *"

"1. Date of the first FCC order regulating CATV."

In spite of the court's expressed desire for promptness, the hearing on the merits of this cause actually began before a hearing examiner on April 15, 1968, and was completed by decision of the FCC on May 7, 1969. Without reciting the lengthy record of this delay,

which we have reviewed with interest, we deem it appropriate to note that most of the delay was occasioned by the same petitioner which originally urged speed.

During the pendency of these proceedings, a number of the issues as originally argued by petitioner have been decided. The fundamental questions of FCC jurisdiction over CATV systems were decided by the Supreme Court of the United States in United States v. Southwestern Cable Co., 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968). In its opinion the Supreme Court specifically held that the FCC had authority to issue the very rules (47 C.F.R. §§ 74.1101–74.1109 (1969)) which are under attack in these cases.

The validity of the FCC's procedure in enacting § 74.1107 has also been upheld by two Courts of Appeals. Black Hills Video Corp. v. FCC, 399 F.2d 65 (8th Cir. 1968); Buckeye Cablevision, Inc. v. FCC, 128 U.S.App.D.C. 262, 387 F.2d 220 (1967). We agree with these circuits that it was within the FCC's authority to enact §§ 74.1101–74.1109 and that the FCC's procedure in adopting the same did not violate either due process or the Administrative Procedures Act, 5 U.S.C. § 1004(a) (1964), as amended, 5 U.S.C. § 554(b) (Supp. IV, 1969).

The issues which remain pertain entirely to Telerama's equitable claims. We believe they may be summarized thus:

1. Was the FCC's April 29, 1966, interpretation of the phrase "new geographical area" as identical with "an independent municipal or governmental subdivision" a valid interpretation of § 74.1107(d)?

2. Does this record contain substantial evidence to support the FCC's findings upon which it denied Telerama's petition for waiver of its rule on equitable grounds?

As to the interpretation of § 74.1107 (d), we find the FCC letter of April 29, 1966, consistent with the letter and even more consistent with the spirit and history of the rule. It was obvious from April 22, 1965 on, that the FCC was seriously considering full scale regulation of CATV systems. And we believe that its Second Report and Order left no reasonable doubt that Telerama could not expand into a new city without complying with the petition and hearing requirements set forth in § 74.1107.

Section 74.1107(b) specifically provides that the request for a hearing to be made under subsection (a) shall "set forth the name of the community involved." 47 C.F.R. § 74.1107(b).

The discussion in the Second Report and Order of the question "whether systems extending signals beyond their grade B contour on February 15, 1966, into one of the top 100 markets, are to continue to add subscribers in new geographical areas" (2 F.C.C.2d at 785) indicates that the Commission was setting up a test in that section to be applied case by case to the problem of expansion to new areas within the same community.

The Commission stated:

"149. The foregoing dealt with grandfathering. We turn now to the question whether systems extending signals beyond their grade B contour on February 15, 1966, into one of the top 100 markets, are to continue to add subscribers in new geographical areas. Such systems, which may recently have gone into operation without regard to the Commission's explicit notice of the pendency of the paragraph 50 proposal, may have relatively few subscribers. In view of the public interest considerations upon which our policy is based, we do not believe that such a system should be allowed to *expand from a few thousand subscribers in one part or suburb of a community to the potential of hundreds of thousands throughout the entire community, until there has been resolution of the serious issues presented (in an evidentiary hearing).* While there may be a disruptive factor in halting CATV

growth in the particular circumstances which should, of course, be taken into account, we believe that if at all practicable, appropriate geographical areas should be delineated, with the CATV growth limited to such areas until resolution of the issues. The problem calls for *case-by-case judgment in the particular community as to the feasibility of action along the foregoing lines and the appropriate geographical area or areas.* Our judgment will therefore be made upon the petition, if any, of the local broadcaster(s) objecting to the geographical extension of the CATV system to new areas, and responses thereto." 2 F.C.C.2d at 785–86. (Emphasis added.) (Footnote omitted.)

The rule as thus interpreted is consistent with the Commission's purpose of limiting the expansion of existing CATV systems carrying distant signals into the major markets until the FCC had made sure, upon the basis of a full hearing, that the public interest in local UHF TV stations would not be adversely affected.

We certainly cannot say that the FCC's April 29, 1966, interpretation of § 74.1107(d) was "plainly erroneous." Udall v. Tallman, 380 U.S. 1, 16–17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 413–414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945).

As to the equities arising out of Telerama's investments, we find somewhat more sympathy than is expressed by the Commission. But we find no more appropriate form of relief than the Commission did. It seems clear to us, as it did to the Commission, that after the April 22, 1965, Notice of Inquiry, Telerama deliberately decided to proceed with substantial cash outlays to attempt to develop a going business before government regulation could affect its right to do so. This was obviously a business gamble made with full knowledge of possible consequences. But it is also obvious that the gamble did not produce the jackpot at which Telerama was aiming. Telerama's objectives and the public interest, as determined by the FCC, collided February 15, 1966, in §§ 74.1101–74.1109 of the FCC regulations. If there were to be effective regulation of CATV, obviously there had to be a date beyond which untrammeled expansion could not occur.

The Commission found, and we agree, that Telerama overstated its actual commitments by a wide margin in its briefs and arguments to this court in its efforts to secure injunctive relief. In this regard the Commission found:

"Thus, in support of its claims of irreparable injury, Telerama represented to the Court that over $300,000 in cash had been expended prior to February 15, 1966, and that it had assumed contractual obligations of close to $800,000. However, the record establishes that those alleged expenditures and commitments do not support a finding of significant injury. A substantial proportion of the cash expenditures were made for its grandfathered CATV systems which are presently in operation, and the claim with respect to its contractual obligations is grossly misleading. This latter figure was arrived at by multiplying by 10 the annual service charge for the 171 miles of cable installed by Ohio Bell, apparently on the assumption that Telerama was obligated to pay this charge for 10 years. However, the evidence establishes that approximately $700,000 of this sum must be allocated to the charges for cable actually used in its current operations, and most of the remainder can be avoided by canceling the lease for the cable which Telerama cannot use. Furthermore, as to the alleged $300,000 expenditure, it appears that installation of a significant amount of cable, for which the nonrecurring charges were advanced, occurred after April 29,

1966, the date when the Commission advised the cable operator that operation of other than the grandfathered CATV systems would subject it to the institution of show cause proceedings. Had Telerama immediately ordered a stoppage of construction, it would have been liable only for nonrecoverable costs actually incurred with respect to any facilities under construction, but would have been relieved of responsibility from other recurring and nonrecurring charges with respect to such facilities." 17 F.C.C.2d 533–34 (1969).

Under the order of the FCC, Telerama retains the right to serve three communities and the right to extend limited service in the city of Euclid. This record does not serve to convince us (as it certainly did not convince the FCC) that such an operation will necessarily prove to be completely uneconomic. And in any event, the FCC order does sanction Telerama's operation to the extent that it was "theretofore established." *See* United States v. Maher, 307 U.S. 148, 153, 59 S.Ct. 768, 83 L.Ed. 1162 (1939).

Finally, Telerama appears to argue that since during the long history of this case the FCC has abrogated its rule (47 C.F.R. §§ 74.1101–74.1109) and replaced it with another (15 F.C.C.2d 431 (1968)), this fact somehow demonstrates the invalidity of the former rule. If the new rule allowed Telerama freely to do that which the old rule prevented, there might be some logic to this argument. Since, in fact, the new rule simply affords a different method of control with largely similar results, we believe its adoption casts no reflection on the validity of the original rule.

The petition for review of the order of the Federal Communications Commission filed in case No. 17,311 is dismissed and the decision of the Federal Communications Commission in case No. 19,644 is affirmed.