PIKES PEAK BROADCASTING COM-
PANY, Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents,

City of Colorado Springs, Colorado, Vu-
more Video Corp. of Colorado, Inc.,
Garvey Communications Systems, Inc.,
National Association of Broadcasters,
National TV Translator Association,
Colorado Translator Association, All-
Channel Television Society, Intervenors.

SANGRE de CRISTO BROADCASTING
CORPORATION, Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents,

Garvey Communications Systems, Inc.,
National Association of Broadcasters,
Vumore Video Corp. of Colorado, Inc.,
City of Colorado Springs, Colorado, Na-
tional TV Translator Association, Colo-
rado Translator Association, All-Chan-
nel Television Society, Pueblo TV Pow-
er, Intervenors.

Nos. 22023, 22024.

United States Court of Appeals
District of Columbia Circuit.

Argued Sept. 27, 1968.

Decided March 24, 1969.

Petition for Rehearing Denied
May 2, 1969.

Certiorari Denied June 23, 1969.
See 89 S.Ct. 2134.

Mr. Richard Hildreth, with whom Mr. Wade H. Hargrove, Washington, D. C., was on the brief, for petitioner in No. 22,023.

Mr. Robert W. Coll, Washington, D. C., with whom Messrs. James A. McKenna, Jr., Vernon L. Wilkinson and Carl R. Ramey, Washington, D. C., were on the brief, for petitioner in No. 22,024.

Mr. John H. Conlin, Associate General Counsel, with whom Messrs. Henry Geller, General Counsel, William L. Fishman, Counsel, Federal Communications Commission, and Howard E. Shapiro, Atty., Department of Justice, were on the brief, for respondents. Mrs. Lenore G. Ehrig, Counsel, Federal Communications Commission, also entered an appearance for respondents.

Mr. Frederick T. Henry, Colorado Springs, Colo., with whom Mr. C. Sherfy Jones, Arlington, Va., was on the brief, for intervenors.

Mr. Alan Raywid, Washington, D. C., with whom Messrs. John P. Cole, Jr., and Roger E. Zylstra, Washington, D. C., were on the brief for intervenor, Vumore Video Corp. of Colorado, Inc.

Mr. John B. Summers, Washington, D. C., was on the brief for intervenor, National Association of Broadcasters.

Mr. Arthur Stambler, Washington, D. C., was on the brief for intervenors, National TV Translator Association and Colorado Translator Association.

Messrs. Martin E. Firestone and Michael Finkelstein, Washington, D. C., were on the brief for intervenor, All-Channel Television Society.

Messrs. Lee G. Lovett and Joseph F. Hennessey, Washington, D. C., were on the brief for intervenor, Pueblo TV Power, Inc.

Mr. Howard F. Roycroft, Washington, D. C., entered an appearance for intervenor, Garvey Communications Systems, Inc.

Before BAZELON, Chief Judge, and TAMM and LEVENTHAL, Circuit Judges.

LEVENTHAL, Circuit Judge:

■ Licensees of Colorado television stations in Colorado Springs (KRDO-TV) and Pueblo (KOAA-TV) have petitioned for review of an order of the Federal Communications Commission authorizing Vumore Video Corporation of Colorado to commence operation of a community antenna television (CATV) system in Colorado Springs.[1] Vumore

---

1. Petitioners are Pikes Peak Broadcasting Company, licensee of Station KRDO-TV in Colorado Springs; Metropolitan

Television Company, former licensee of Station KOAA-TV in Pueblo, Colorado; and Sangre de Cristo Broadcasting Cor-

and other interested parties have intervened in these proceedings.[2] Despite certain defects in its opinion, we think the Commission's decision is supported by the record and should be affirmed.

The basic question presented by these petitions before the Commission was whether Vumore's proposed CATV service,[3] particularly the importation of Denver signals, posed a sufficient threat to the economic health of existing television stations or to potential development of UHF broadcasting in the Colorado Springs-Pueblo market to warrant or require holding an evidentiary hearing on those issues. Petitioners also requested that the issues of concentration of control of communications media and Vumore's plans for pay-TV be set for hearing. Petitioners claim error in the Commission's grant of authority in the absence of any such evidentiary hearing.

The Commission's response must be considered in the context of its broad regulatory program for CATV. The potentially injurious impact of CATV on the free-television system through fragmenting audiences and revenues prompted the Commission's assertion of jurisdiction over cable as well as microwave CATV operations in its Second Report and Order, 2 F.C.C.2d 725 (1966), issued after extensive rule-making proceedings. In its decision affirming the Commission's jurisdiction, the Supreme Court agreed that prompt and effective regulation of CATV is a necessary correlative of the Commission's " * * * broad responsibilities for the orderly development of an appropriate system of local television broadcasting." United States v. Southwestern Cable Co., 392 U. S. 157, 177, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968). See also Buckeye Cablevision, Inc. v. FCC, 128 U.S.App.D.C. 262, 387 F.2d 220 (1967).

The Commission determined in the *Second Report* that CATV did not pose the same threat to free television in all

poration, Metropolitan's assignee. They petition under 47 U.S.C. § 402(a) for review of the Commission's decision and order in Vumore Video Corp. of Colorado, Inc., 12 F.C.C.2d 955 (May 24, 1968).

2. The City of Colorado Springs joined in Vumore's brief for affirmance of the Commission's decision. A separate brief for affirmance was filed by Pueblo TV Power, Inc., authorized to operate a CATV system in Pueblo. A joint brief for reversal was filed by the National Association of Broadcasters, the National TV Translator Association, the Colorado Translator Association, and the All-Channel Television Society. Garvey Communications Systems, Inc., licensee of Station KKTV-TV, Colorado Springs, filed a separate statement in support of the petitioners.

The Commission denied several requests to consolidate this proceeding with several other pending CATV proposals which would affect Denver and Pueblo. It denied the Denver request, stating that its policy was not to include petitions from smaller market stations with mandatory major-market hearings. The microwave and CATV authorizations involving Pueblo were said to be at an early stage in the proceedings, and the Commission chose not to deny Vumore its right to expeditious consideration of its long pending no-

tification. 47 C.F.R. 74.1109(f) (1968). The Commission further stated that much of the information submitted and examined in this proceeding related to both Colorado Springs and Pueblo. We note that the Coe-Saunders Report is a study of the Colorado Springs-Pueblo market and its conclusions apply to both cities. While the cumulative impact of multiple CATV operations in an area may in some cases call for consolidated proceedings, we think that the Commission has broad discretion its own proceedings and gave adequate reasons for denying the requests for consolidation here.

3. On August 16, 1967, Vumore gave notice pursuant to 47 C.F.R. 74.1105 (1968) of its intention to establish a CATV system in Colorado Springs. Its proposed service includes carriage of two Colorado Springs stations, one Pueblo station, three Denver commercial stations with network affiliation, one Denver independent station, one Denver educational channel, and two channels of news, weather, and music selected from area FM radio stations. Petitioners objected only to the carriage of the Denver stations proposed in the notice, except for the educational channel. They acquiesce in the carriage of the Denver educational channel only until the Pueblo educational channel becomes operative.

markets. Specifically, it decided that independent UHF stations or wire pay-TV based upon CATV operations are most likely to develop in the top 100 markets, and that, accordingly, further audience fragmentation in those markets through competition from outside stations could have serious consequences.

In the smaller markets, below top 100, the Commission judged that independent VHF or UHF stations are less likely to develop. Smaller markets are likely to be underserved, and there CATV will make a positive contribution by bringing in independent (non-network) programming not otherwise available.

The Commission also observed that smaller markets are likely to contain three or fewer network-affiliated stations. The significance of network affiliation lies in the fact that the Commission's carriage and non-duplication rules, requiring CATV carriage of local stations and providing substantial exclusivity for local network programming, will protect the local stations' audience for network programs and revenues from network sources, thus insuring the stations' continued viability. Second Report and Order, *supra* at 783.[4]

The Commission's applicable rules governing hearings on proposed CATV operations—as in effect at the time of this proceeding—reflect these judgments concerning the differences between major and smaller markets. CATV systems proposing to operate within the Grade A contour of a television station located in a top 100 market cannot import distant signals [5] until the Commission makes a positive determination that importation of distant signals will be consistent with the public interest. 47 C.F.R. 74.1107(a) (1968). In general the rule contemplates that such determination for the top 100 markets will be made only after evidentiary hearing, though there is provision for waiver of hearing on appropriate petition. 47 C.F.R. 74.1109 (1968). In contrast, CATV systems proposing service in markets below top 100 are generally free to proceed, after notice to local stations, without awaiting a hearing. This is subject to the possibility that the Commission may grant a petition from an affected broadcast station for special relief under the waiver rule,—both for relief on the merits to halt or condition the operation of the CATV system, and for ancillary procedural protection, giving

4. The carriage and non-duplication rules were imposed upon CATV systems using microwave facilities in the First Report and Order, 30 F.C.C. 683 (1965). These rules were modified and extended to non-microwave CATV operations in the Second Report and Order, *supra*. The carriage rules require a CATV system to carry the signals of stations serving the community in which the system operates. The non-duplication rules prohibit CATV systems from duplicating the programs of the local stations on the same day. The effect of these rules is to maintain the local stations as exclusive outlets for most of their network programming.

5. The Commission has defined the term "distant signal" as a signal "which is extended or received beyond the Grade B contour of that station." 47 C.F.R. 74.1101(i) (1968). The carriage rules require CATV systems to transmit to their subscribers Grade B signals reaching their service area. The chief purpose of the CATV hearing rules is to permit

assessment of the need for restrictions on CATV importation of signals not reaching the system's service area at all. The predicted Grade B contour of the Denver signals reaches Colorado Springs, but not Pueblo. Some argument has ensued over whether petitioner Pikes Peak is entitled to object to the importation of the non-distant Denver signals. We think that the record adequately shows that the Denver stations are not in fact generally viewable in Colorado Springs due to transmission problems over the rugged terrain. The Commission has recognized that there may be situations where CATV importation of non-distant signals will affect viewer patterns and threaten substantial audience fractionalization. Second Report and Order, *supra*, at 786 n. 69. There would be no dispute and probably no CATV proposal either if Denver stations were already widely viewable in this market, and we see little point in the Commission's extended quibble over this question.

petitioner an opportunity to be heard before the CATV system is given authority to proceed. 47 C.F.R. 74.1107(c) (1968). The petitioner must state facts sufficient to show that relief is needed and would serve the public interest. The Commission may make its determination of the public interest issues on the pleadings, or it may specify other procedures such as oral argument, evidentiary hearing, or further written submissions as appear appropriate. 47 C.F.R. 74.1109 (1968).

■ Petitioners do not challenge the Commission's 100 major market distinction and the procedural differences based on it. They carry the burden, therefore, of showing that the Colorado Springs-Pueblo television market, ranked 138th, does not conform to the pattern of below top 100 markets described by the Commission, and of demonstrating that the presumption, reflected in the rules, that importation of Denver signals is in the public interest has been sufficiently negatived by the showing in their papers to require an evidentiary hearing.

In support of their contention that the Colorado Springs-Pueblo market requires an exception from the general CATV rules for markets under the top 100, petitioners sought to show (1) that this market is likely to support an independent UHF station within the reasonably foreseeable future and (2) that the carriage and non-duplication rules providing exclusivity for local network programming will not adequately protect the three existing network-affiliated stations from losses due to CATV.

In support of these two economic arguments, petitioners submitted a report entitled An Analysis of the Colorado Springs-Pueblo Television Market: Its History, Status and Future, prepared by Dr. James L. Saunders and Robert L. Coe, of the Center for Research on Broadcast Management and Economics, School

of Communications, Ohio University. In rejecting the conclusions of the Coe-Saunders Report, the Commission was not required to reiterate the general findings of its Second Report underlying the conclusion that, in general, introduction of CATV serves the public interest in smaller markets. It was called upon to make a considered disposition of the claim that the Coe-Saunders Report warranted an exception to its smaller-market rule or at least raised questions sufficient to require an evidentiary hearing.

■ The Commission's disposition of the central economic issues here is marred by small and sometimes mistaken criticisms of the Coe-Saunders Report. However, it serves little purpose to remand a case for correction or clarification of subsidiary matters not central to an agency decision when, as here, the decision is accompanied by findings and analyses supported by the record against the background of the Second Report and sufficient to show that the result is reasonable and in conformance with the statute and regulations. Braniff Airways, Inc. v. CAB, 126 U.S.App.D.C. 399, 379 F.2d 453 (1967). We consider petitioners' contentions seriatim.

### 1. POTENTIAL FOR UHF DEVELOPMENT

■ Petitioners argue that, contrary to the Commission's negative view of prospects for independent UHF stations in smaller markets, the Colorado Springs-Pueblo market will be able to support an independent UHF channel by 1972, unless CATV service is introduced. We have given special attention to this argument, because if a real possibility of UHF now exists, it will almost surely be foreclosed by CATV for the foreseeable future.[6] The Commission was justified, we think, in doubting UHF development in this market and in concluding that carriage of the Denver in-

---

6. The judgment on potential for UHF development also merits special examination because it appears to be the main point of disagreement between the majority opinion and the dissent of Commissioner Cox.

dependent station and others by CATV was the more promising way to broaden service to the community.

The Commission stated that, despite petitioners' attempted showing of conditions favorable to UHF, there had been no applications for the UHF assignment and no indications that any would be filed. Its judgment was informed by experience with UHF operations and applications.[7] Moreover, there are significant weaknesses appearing on the face of the Coe-Saunders case for the likelihood of UHF development. The Report states that television revenues of $3,000,000 will be necessary to support an independent station by 1972, but its own prediction of 1972 revenues is only $2,500,000. The Report then concludes that the $500,000 differences is "present" because current television revenue per home in the market is below average and "the Colorado Springs-Pueblo area might well produce more." (Appendix I, Exhibit G, 288). The Report offers no substantial support for this optimistic forecast. It also states that the market stations have had an unusually high expense-revenue ratio, a factor which would seem to make the picture still more dismal. A favorable inference might have been drawn if the Report had set forth facts to provide a basis for predicting that there would be a change in conditions, and that income per TV home would increase or the expense-revenue ratio would decline; but no such facts were offered. There is no basis in the abstract to suppose that conditions in the Colorado Springs-Pueblo market will change. An average is a combination of highs and lows. The fact that a market area has been on the low side of the national average in the past is not of itself a basis for predicting it will be on the high side in the future. If anything, it would seem more reasonable to project that it will stay below average unless there are facts portending a change in conditions.

The Report does observe that a new station itself generates additional revenues, but this prospect would hardly be adequate incentive for investment in a new station under otherwise unfavorable conditions. The Commission did not act unreasonably in rejecting as inadequate a proffer of a prediction of UHF development that was supported by only such speculative contingencies.

### 2. ECONOMIC INJURY TO EXISTING VHF STATIONS

Since a decline in audience portends a decline in advertising revenues, the estimate of the amount of revenue of broadcast stations that will be dried up by CATV depends upon the estimate of the degree of CATV penetration (number of subscribers) and the level of viewer defection to stations brought into the market via CATV. Stated simply, petitioners' argument is that CATV penetration in the Colorado Springs-Pueblo market will be substantial and that the protection from viewer defection afforded to their network programming by the non-duplication rules will not prevent serious economic loss. They allege (a) that audience fragmentation by CATV will result in substantial revenue losses in their market and (b) that they will be forced into competition with the larger Denver stations in procuring independent (syndicated and feature film) programming sold on a market exclusivity basis when the Denver stations command a substantial viewing audience in the Colorado Springs-Pueblo market. They conclude that predicted losses will necessarily result in curtailment of their high-cost local and public-affairs programming, contrary to the public interest.

### (a) *Projection of losses due to audience fragmentation*

■ The Commission recognized that the introduction of CATV would have an economic impact on the local stations,

---

7. The smallest market in which a UHF station competes with three VHF stations is presently Lynchburg-Roanoke, Virginia, a market with more than three times the number of television households in the Colorado Springs-Pueblo market.

but concluded that this would not be sufficient to threaten their viability. This judgment finds support in the record. First, the Coe-Saunders Report shows on its face that the protection afforded in this market to the stations' audiences and revenues by the non-duplication rule is as great or greater than the protection generally contemplated for smaller market stations in the *Second Report*. The Report states that television stations in the Colorado Springs-Pueblo market receive a comparatively high percentage of their revenues from network sources (22% as compared to a general 16.6% average), and that network revenues are growing at rates above the norm. In addition, spot advertising adjacent to network programs accounts for 23% of Station KRDO's non-network revenues and 33.5% of Station KOAA's non-network revenues. Thus, revenues for these two stations in the range of 40-50% are derived from programming protected by the non-duplication rule.

The Coe-Saunders Report also states that 36.6% of the local stations' revenue is from local advertisers, while the average from this source is 23.7%. Petitioners contend that national and regional advertisers will be able to turn to Denver stations to reach part of the Colorado Springs-Pueblo market if Denver CATV channels attain high ratings there. This may develop in the future, but it would seem unlikely that local advertisers would be willing to pay higher Denver rates for the relatively small portion of the market audience they wish to reach. A substantial portion of local advertising revenues is likely to remain oriented to the local television stations.

In its analysis of the Coe-Saunders Report, the Commission pointed out errors in calculations which overstated the extent of the losses projected for petitioners. For example, Table III, Exhibit H of the Report, showing losses at varying levels of CATV penetration and viewer defection, is based on a market of 90,000 TV homes, the total for the two-county area. However, as the dissenting Commissioner concedes, the CATV systems whose impact is analyzed in the Report will operate only in the core cities of Colorado Springs and Pueblo, containing only about 60,000 TV homes. Retaining the assumption of the Coe-Saunders Report of a minimum of 25% CATV penetration and 30% viewer defection, but making a downward adjustment from 90,000 to 60,000 homes, the calculated loss of some $123,000 would recalculate at approximately $82,-000. Other problems in the Coe-Saunders projections make it likely that even the adjusted figure is a high-pitched estimate of losses due to CATV.[8]

The Commission's conclusion on the economic injury issue is also supported by a different, perhaps an alternative ground. The Commission held that the general increases in television advertising revenues in the market projected in

---

8. For example, the Coe-Saunders estimates of viewer defection are based on an analysis of the impact of CATV in the Bakersfield, California television market. As petitioner Pikes Peak Broadcasting Company concedes in its reply brief (at 25), the Bakersfield system imported the signals of three independent Los Angeles stations as well as the network affiliates. The non-duplication rules afford no protection to local stations from competition from independent stations. Here, however, the CATV system proposes to bring in only one Denver independent station, which presages a lower rate of defection in the Colorado Springs-Pueblo market.

In its main brief, Petitioner Pikes Peak estimates a higher minimum loss, basing its projection on 60% CATV penetration instead of the Coe-Saunders estimate of 25%. The support of record for this estimate is a statement that according to a trade periodical, one of Vumore's principals was reported to have said that Vumore anticipated 60% saturation in Colorado Springs in seven years. (Appendix I, 92) This court does not propose to choose among these conflicting forecasts. It suffices to say that some reasonably clear and substantiated estimate of losses was required to met petitioners' burden under the rules, and we do not find that kind of showing in the papers before us.

the Coe-Saunders Report itself would be sufficient to protect the viability of the local stations. Exhibit G of that Report states that television revenues in the Colorado Springs-Pueblo market can be expected to increase at the rate of at least $100,000 per year. This forecast is based upon general growth factors such as increases in population, number of TV homes, income per household, and retail sales. (Appendix II, Exhibit G, 282–84.) While these projected increases in market revenues would have to be adjusted for the impact of CATV, including the possibility of lower advertising rates, they certainly cushion against a sharp absolute decline in revenues for the local stations.[9]

■ We think the Commission's conclusion that the stations would remain financially viable is supported in the record and is not lacking in reasoned judgment. There was no need for the Commission to accord an evidentiary hearing to give petitioners an opportunity to develop evidence when the proffer, even if confirmed by testimony in the hearing room, was not sufficient in the Commission's view to establish a need for an exception from its general findings and policy for CATV in smaller markets.

### (b) Problem of competition with Denver stations

■ The argument that the Colorado Springs-Pueblo stations will be forced to bid against Denver stations for syndicated programming sold on a market exclusivity basis assumes very substantial shifts in viewing patterns, tending over the long run to merge the Denver and local markets. Petitioners could not be

expected to provide detailed factual support for this allegation. At the same time, it is doubtful that this argument could be further substantiated in an evidentiary hearing. We think the Commission could reasonably reserve judgment on a forecast looking so far into the future.

### (c) Reasonableness of Commission's judgment in view of its option to reconsider and provide future protective relief upon a showing of actual injury

■ It is important to emphasize, and perhaps decisive, that the Commission's judgment on all of these economic forecasts is a provisional one, subject to modification if the viability of the existing stations is in fact impaired by CATV. The CATV rules, including the different hearing requirements and burdens allocated to CATV and the stations in major and smaller markets, are intended to accommodate the benefits of CATV and the legitimate claims of local broadcasting to protection for its vital public service function. As the Second Circuit observed in sustaining the Commission's regulation of pre-sunrise radio broadcasting, " * * * we cannot fault the Commission for believing a compromise between these competing claims constitutes the best solution. If experience should show the particular compromise here adopted to be less beneficial than the Commission believes, the road to change is always open." WBEN, Inc. v. United States, 396 F.2d 601, 614, cert. denied 393 U.S. 914, 89 S.Ct. 238, 21 L.Ed.2d 200 (1968).

■ We think that petitioners have not met the burden of showing a likelihood that their viability will be

9. The agency was not required to accept the apparent assumption of Commissioner Cox, in dissent, that the introduction of CATV will drain off all benefit from general increases in market advertising revenues. It seems doubtful that declines in rates for advertising would be so drastic as to exceed significantly any increases in advertising dollars that go into television. Increases in population and television homes would help to stabilize the stations'

audiences. It seems likely that local TV advertisers will remain oriented to local media and will not regard other media as fully satisfactory substitutes for television advertising. Assuming local advertising expenditures increase and the supply of air-time remains limited with only three local broadcast stations, there would be mitigation of any sharp reduction in advertising rates.

imperiled, with consequent dilution of public service. Experience may reveal that the protection afforded to smaller market stations by the carriage and non-duplication rules is too little and the burden of showing special injury too great, but it is too soon to say the Commission struck a bad balance. We need only add that the public interest in maintaining free and local television service to both urban and rural viewers is more than sufficient to justify extraordinary remedies should they later be required. CATV operators must recognize, as Vumore's counsel conceded before this court, that they have no vested right to transmit a maximum number of signals to an unlimited number of subscribers if local broadcasting is jeopardized. The Commission's authority over CATV operations extends to whatever is "reasonably ancillary to the effective performance of [its] various responsibilities for the regulation of television broadcasting." United States v. Southwestern Cable Co., *supra,* 392 U.S. at 178, 88 S.Ct. at 2005, 20 L.Ed.2d 1001. This must include the power to correct false starts and to cut back CATV operations if more experience shows this policy best serves the public interest. If developments in the Colorado Springs-Pueblo market confirm petitioners' dour predictions, they are free to seek further relief based on a factual showing of injury. Second Report and Order, *supra,* Para. 150 at 786.[10] Cf. Permian Basin Area Rate Cases, 390 U.S. 747, 764 and 770–771, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968).

### 3. CONCENTRATION OF CONTROL OF COMMUNICATIONS MEDIA

Petitioners allege that Vumore, its stockholders and principals, own numerous other CATV systems, microwave systems, and television stations in the country, and urge that the Commission hold a hearing on the issue of concentration of control of communications media. The Commission has the question of CATV cross-ownership under study in a rule-making proceeding, Notice of Inquiry in Docket No. 17,371, 7 F.C.C.2d 853 (1967). We think it was within their discretion to decline to set the matter for earlier consideration in an adjudicatory hearing related to a particular market area. There are now no rules limiting ownership of CATV facilities by persons with other media interests. With program origination by CATV in an early stage of development, the need for rules to preserve diverse ownership of independent voices of opinion has perhaps been less pressing. Of course, the CATV system will increase the number of independent sources of information in the Colorado Springs-Pueblo community. The Commission also observed that Vumore's cross-ownership of media is not in the same market.

We agree with petitioners that the issue of concentration of control is important, and calls for prompt Commission action. However, we cannot expect instant regulation of all aspects of this complex and dynamic industry. The Commission should be afforded some time to develop a general policy enforced by rules. It will be able to remedy undue concentration of control if it occurs in the interim by retroactive adjustments, provided they are reasonable. Niagara Mohawk Power Corp. v. FPC, 126 U.S.App.D.C. 376, 379 F.2d 153 (1967). CATV systems are on notice that subsequent rules on multiple ownership may affect them. Midwest Television, Inc. (KFMB-TV), 13 F.C.C.2d 478 (1968), Para. 67 at 508. The pros-

---

10. The Commission stated its position as follows: "As we gain more knowledge in this important area, particularly from the hearings being held, we shall revise or terminate the procedure, as the experience indicates. The present rules are our best judgment of what the public interest now calls for. We recognize that they may not perfectly fit every situation, and repeat that should they be inadequate or unduly burdensome in individual cases, special action or waiver can be obtained upon an appropriate showing." Second Report and Order, *supra* at 786.

pect of future regulation in this new industry is the price of getting underway now.

4. PROSPECT AND IMPACT OF CATV SERVICE OTHER THAN THE RELAY OF THE SIGNALS OF BROADCAST STATIONS: PAY-TV AND PROGRAM ORIGINATION

Petitioners also requested that the Commission consider at a hearing Vumore's plans for program origination and pay-TV, a standard issue in major market CATV proceedings. The Commission observed that pay-TV on a per-program basis is prohibited by the terms of Vumore's franchise from the City of Colorado Springs. This prohibition does not, however, forbid purchase of programs and closed-circuit transmission on vacant CATV channels at an additional charge to subscribers.

█ The development of pay-TV or potential competition from CATV program origination, with or without an identified extra charge, cannot be dismissed as mere speculation in this market. However, consideration of Vumore's plans for service other than the relay of broadcast signals is not essential to a decision to allow the importation of Denver signals. Vumore's venture does not appear to be conditioned upon offering extensive closed-circuit services, and such services pose no immediate threat to the local stations. We think, therefore, that it was within the Commission's discretion to reserve these questions for future rule-making or petitions for special relief if and when these services take shape and adversely affect local broadcasting. See Midwest Television, Inc. (KFMB-TV), *supra*, Para. 67 at 508.

Subsequent to the preparation of this opinion and prior to its release, the Commission issued and called to our attention a notice of proposed rule-making that significantly concerns CATV and is addressed, *inter alia*, to such subjects as multiple ownership of CATV systems and CATV potential for program origination and pay-TV. Notice of Proposed Rulemaking in Docket No. 18,397, FCC Release No. 68–1176 (December 13, 1968). We cannot anticipate the ultimate form or effect of the proposed rules. However, the Commission's action dramatizes the fact that CATV regulation is in a state of flux and revision and confirms our judgment that it is not reasonable to require the Commission to spell out premature solutions to all problems prior to the authorization of any CATV service in smaller markets.

█ Putting to one side the possibility that rule changes may have a substantial bearing on the kind of case before us,[11] we hold as to this case that petitioners have not shown that the regulations in effect were arbitrarily applied because the Commission failed to shed new light on the standards for a showing sufficient to require an evidentiary hearing. The standard would perhaps have become sharper had the Commission focused upon clearer rebuttal of petitioners' central allegations. But this court's province in reviewing an agency decision is to see whether "the path which it followed can be discerned." Colorado Interstate Co. v. FPC, 324 U.S. 581, 595, 65 S.Ct. 829, 836, 89 L.Ed. 1206 (1945). We fairly discern from the opinion as a whole the Commission's view that the conclusions of the Coe-Saunders Report, discounted by its inflated inferences and judged against the background of the *Second Report,* fall short of establishing a probability that UHF development is likely in the Colorado Springs-Pueblo market and that the viability of local broadcasting will be jeopardized by CATV.

The presumptions reflected in the CATV regulations and procedures established for smaller markets are themselves

---

11. We have, of course, decided this case on the record and regulations before us. We intimate no opinion on whether or to what extent changes in the rules would affect the rights of the parties in further or different proceedings before the Commission.

only predictions, but educated guesses are a necessary part of the Commission's job. "It is part of the genius of the administrative process that its flexibility permits adoption of approaches subject to expeditious adjustment in the light of experience." American Airlines, Inc. v. CAB, 123 U.S.App.D.C. 310, 319, 359 F.2d 624, 633 (en banc) (1966), cert. denied, 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966). We are satisfied that the Commission gave petitioners' predictions a hard look. We are assured that if events in Colorado Springs prove the Commission wrong, petitioners will have recourse to the Commission upon a showing of actual injury for such protection as may be appropriate upon a balancing of all interests, including the public's.

Affirmed.

BAZELON, Chief Judge (concurring in part and dissenting in part):

Two aspects of this case trouble me. The first is the continued failure of the FCC to clarify the standards which govern the decision to hold an evidentiary hearing in a market below the top 100. The second is the cavalier refusal of the FCC to consider the issue of cross ownership on the unelaborated ground that the issue is currently under study by the Commission in a rule-making proceeding.

I

Cedar Rapids Television Co. v. FCC, 128 U.S.App.D.C. 270, 387 F.2d 228 (1967), also involved a refusal by the Commission to hold an evidentiary hearing concerning the importation of a distant signal into a market outside the "Grade A" contour of a television station located in the top 100 markets. Since the petitioners there had failed to produce any documentation to show that UHF development might be deterred by the CATV operation or that existing service might be threatened, we affirmed the denial. However, after agreeing with the "Commission * * * that if hear-

ings were required on the sort of 'bare-bone' petition filed here, then hearings would almost always be required," we observed,

> Perhaps the paucity of information explains the Commission's failure to make clear in its memorandum opinion the burden of proof it expects petitioners seeking an evidentiary hearing to meet. Although the record in this case is such as to make it pointless to remand for a fuller explanation, we think it necessary to remind the Commission that particularly when, as here, it embarks into a new field of regulation, there is a special need for a fuller statement of its reasons.

Id. at 274, 387 F.2d at 232.

Several months later, in Eastern Microwave, Inc., 11 F.C.C.2d 146 (1967), the Commission held that the petitioner had failed to bear "the initial burden of establishing the existence of special circumstances which would warrant a hearing." Id. at 147. Apparently attempting to meet the strictures of Cedar Rapids, the Commission elaborated its reasons:

> [The petitioner] has failed to supply any specifics, by affidavit or otherwise, regarding its financial condition, the impact that the present CATV system has on its operation, the impact that the proposed additional signals would have, or the manner in which the present or proposed CATV operation relates adversely to Brockway's operation to the detriment of the viewing public.

In this case, unlike Cedar Rapids and Eastern Microwave, the Commission can hardly argue that no documentation was submitted for the petitioners' claims that the proposed CATV operation would reduce the likelihood of an independent UHF station and threaten the viability of existing stations. Instead, the Commission examines the exhaustive Coe-Saunders report and other material submitted by the petitioners, criticizes various aspects of it, and concludes (1) "our analysis of this market indicated no like-

lihood of UHF activation in at least the near future," and (2) "it does not appear that the potential impact [of the CATV system] would be sufficient to threaten the viability of existing or potential stations." Consequently, the Commission decides that the petitioners have "failed to establish special circumstances which would justify grant of the special relief it has requested."

This refusal to grant "special relief" confounds the separate questions of whether the importation of distant signals should be prohibited and whether the petitioners are entitled to a hearing on that issue. Insofar as the former question is concerned, I would agree that the petitioners have not demonstrated their case. The appearance of an independent UHF station does appear speculative; the probability of such economic harm as would threaten the viability of the present VHF station seems low.

But surely this cannot be the standard which must also be met for a hearing. To impose a requirement that the petitioners must prove by a preponderance of the evidence the case for non-importation of distant signals in order to be entitled to the evidentiary hearing which they seek in order to demonstrate the case against importation of signals would be a bizarre and circumlocutous way of announcing there never shall be any hearings in these markets.

Of course, the decisions of the Commission in this area suggest that this may indeed be the intended message—with the caveat that the FCC retains the right to grant a hearing when it pleases and for whatever unannounced reasons it pleases. In denying a hearing in this case, the Commission contributed only this analysis of the standards which determine the need for a hearing:

> [A]bsent a special showing made pursuant to Section 74.1109 of the Rules, there is no need for prior evidentiary hearing before CATV service may be instituted in below top-100 markets.

This case, like the previous cases in which the FCC has denied a hearing in such cases, gives little or no suggestion what constitutes a "special showing." Nor do those cases in which the Commission has granted a hearing. Taft Broadcasting Company, 5 F.C.C.2d 746 (1966), involved the Lexington, Kentucky, market, which ranks 141st, three notches lower than the Colorado Springs-Pueblo market. The Commission held:

> In view of the nature of the Lexington market, its present UHF activity, and the facts set forth in the pleadings, a substantial question is raised as to the impact of the CATV systems upon UHF development. We will explore this question in a hearing.

*Id.* at 747.

Aside from a pending application for an educational UHF station in Lexington at the time of the decision, there seems little to distinguish that case from the present one. Certainly a "substantial question" has been raised here. And in *Taft Broadcasting*, the Commission seemed content with "the facts set forth in the pleadings"—a strange departure from the disdain with which it has viewed pleading allegations unsupported by evidentiary documentation in other cases.

United Transmission, Inc., 6 F.C.C.2d 786 (1967), involved several communities in Kansas, none of which were in a top-100 market. Two existing stations alleged that the proposed CATV systems would threaten their viability. The Commission decided that a hearing was necessary:

> As is frequently the case in economic impact cases, KSN's underlying assumptions leave lingering doubts, such as: Whether only the "net KCKT grade B area" is the proper measure of KCKT's circulation or profitability; whether KSN's accounting allocations are correct; and whether—in this market—KSN's estimates of the cost of CATV competition are realistic, particularly since KCKT is a semisatellite. But whatever our final decision, KSN's allegations and supporting documentation evoke sufficient concern to require evidentiary hearing. * * *

*Id.* at 787.

Of course, in this case it was just such "lingering doubts" concerning the validity of the petitioners accounting allocations and cost estimates which the Commission advanced to justify the refusal of relief.

The majority opinion of this Court, in examining the potential for UHF development in the Colorado Springs-Pueblo market, seems as uninterested as the Commission in treating separately the merits of the petitioners' case and the need for a hearing. The same is true concerning the issue of economic injury to existing VHF stations, except that the majority makes the alternative argument that no hearing was necessary since the allegations of the petitioners, even if true, were not sufficient to demonstrate a threat to their viability. The majority reaches this result by (correctly) recalculating the *minimum* estimated loss from CATV competition downward from $123,000 to $82,000 and suggesting that the estimated $100,000 annual increase in advertising revenue in the market would cover this loss easily.

But the *Coe-Saunders* report submitted by the petitioners provided a variety of loss estimates. While the minimum was $123,000, the maximum was $687,000. Adjusting this latter figure downward to correct for the error in the report concerning the number of households affected produces a maximum loss estimate of $458,000. Since the estimated growth in advertising revenues would hardly match losses of this magnitude, it is hardly accurate to argue that the petitioners' claims did not, even if believed, demonstrate a threat to their viability.

Whenever a hearing is denied, the Commission points out to this Court the cost and delay of hearings and the number of petitions with which it must deal. I sympathize with its plight. I also sympathize, however, with the petitioners in this and other cases who take the Commission at its repeated word that there are "special circumstances" that will justify a hearing. It does not seem impossible to demand of the FCC that it tell present and potential petitioners, as well as this Court, just what those "special circumstances" might be.

An evidentiary hearing involves cost and delay. But so does a protracted administrative proceedings and appeal to decide whether a hearing is necessary. The FCC might well reduce its often-complained of workload by announcing with greater particularity the standards which govern the decision to grant a hearing, and thereby perhaps reducing the number of cases such as this where both the petitioners and the Commission have devoted considerable time and effort to the question of whether a hearing is necessary.

Normally, I would vote for a remand in this case in order for the FCC to answer such questions as the burden of production a petitioner must bear to justify a hearing and the sort of information relevant in meeting that burden. However, the notice of proposed rulemaking issued by the Commission after oral argument in this case indicates that substantially different standards are contemplated for the importation of distant signals into below top-100 markets. Notice of Proposed Rulemaking in Docket No. 18,397, FCC Release No. 68–1176, Paras. 55–58 (December 13, 1968). Since the CATV systems involved in this case have not yet begun operation because of the July 3, 1968, order of this Court staying the authorization granted by the Commission, they will be subject to these new rules. *Id.* at Para. 59. Consequently, I can see no utility to a remand in this case for a clarification of hearing standards under the old rules.

## II

The Commission refused to consider the issue of multiple ownership of CATV systems in this proceeding because "the Commission retains adequate authority to deal with the question should action later appear desirable." The majority opinion accepts this representation, noting that the proposed rulemaking proceeding referred to in the preceding paragraph will also deal with the issue of multiple ownership.

I agree with the majority that "it is not reasonable to require the Commission to spell out premature solutions to all problems prior to the authorization of any CATV service in smaller markets." But, on the other hand, neither is it reasonable to disregard completely whether any new rules dealing with multiple ownership can or will in fact be applied to the market involved in this case.

In the section of its notice of proposed rulemaking dealing with multiple and cross ownership, the Commission states, "We stress that no grandfathering is contemplated, although consideration will be given to the question of affording an appropriate period within which compliance * * * is to be achieved." *Id.* at Para. 23.

My enthusiasm for this declaration of good intentions is tempered by the fact that the Commission has stated flatly in those sections of its notice dealing with importation of signals into both top-100 and below top-100 markets that any new rules will be applicable to CATV systems not yet in operation. *Id.* at Paras. 52, 59. If such explicitness is possible in those areas, why not in the areas of cross and multiple ownership?

The specter of grandfathering is hardly illusory. In the area of signal importation, the notice of proposed rule-making does provide that CATV systems already in operation will not be affected by the new rules "in view of the general impracticability or rolling back established service." *Id.; see also*, Second Report and Order, 2 F.C.C.2d 725, 782 (1966).

Perhaps diversification of ownership is more easily ordered than a rollback of established service. *But cf.* Community Broadcasting Co. v. FCC, 107 U.S.App. D.C. 95, 101, 274 F.2d 753, 759 (1960). But our experience with the problem of grandfathering in the communications industry has been such that I am unwilling to accept blithely the Commission's assurances of good intentions. Since there is no explicit provision against grandfathering in the part of the notice of proposed rulemaking dealing with concentration of media ownership, I would remand this case to the Commission for a more complete statement of precisely the "adequate authority" it retains to deal with the problem in the Colorado Springs-Pueblo market. *Cf.* United Transmission, Inc., 10 F.C.C. 118, 119 (1967).