474 F.2d 724
 1973-1 Trade Cases 74,568, 100 P.U.R.3d 148
 GTE SERVICE CORPORATION and GTE Data Services Incorporated,
Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents, United States Independent
Telephone Association (USITA) et al.,
Intervenors.
UNITED TELEPHONE COMPANY OF MISSOURI and United Computing
Systems, Inc., et al., Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents, Mankato Citizens Telephone
Company et al., Intervenors.
WESTERN UNION TELEGRAPH COMPANY, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents.
INTERNATIONAL TELEPHONE AND TELEGRAPH CORPORATION, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents, CTSS of Association of Data Processing
Service Organizations, Inc. (ADAPSO), and Business Equipment
Manufacturers Association (BEMA), Intervenors.
CONTINENTAL TELEPHONE CORPORATION, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents.
 Nos. 97, 185, 186, 187, 188, Dockets 71-1300, 71-1484,
72-1486, 72-1566, 72-1578.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 27, 1972.
Decided Feb. 1, 1973.
 
 George E. Shertzer, New York City (William Malone, Washington, D. C., and James V. Carideo, Tampa, Fla., of counsel), for Petitioners, GTE Service Corp. and GTE Data Services Inc.
 Warren E. Baker, Shawnee Mission, Kan. (Paul G. Pennoyer, Jr., and Chadbourne, Parke, Whiteside & Wolff, New York City, Edmund E. Harvey and Lloyd D. Young, Washington, D. C., of counsel), for petitioners, United Telephone Co. of Mo. and United Computing Systems, Inc., and others.
 Richard C. Hostetler, New York City (Jack Werner and Robert N. Green, Washington, D. C. of counsel), for intervenor-petitioner, Western Union Telegraph Co.
 Robert E. McKee, New York City, for petitioner, International Telephone and Telegraph Corp.
 Raymond L. Falls, Jr., New York City (Don H. Wallach, Washington, D. C., Mathias E. Mone and Cahill, Gordon, Sonnett, Reindel & Ohl, New York City, of counsel), for petitioner, Continental Telephone Corp.
 Charles A. Zielinski, Counsel, F. C. C., Washington, D. C. (John W. Pettit, Gen. Counsel and Joseph A. Marino, Associate Gen. Counsel, F. C. C., Washington, D. C., Thomas E. Kauper, Asst. Atty. Gen., and Harry First, Atty., Dept. of Justice, Washington, D. C., of counsel), for respondents, F. C. C. and United States.
 Joseph M. Kittner, Washington, D. C. (Edward P. Taptich and McKenna, Wilkinson & Kittner, Washington, D. C., John S. Voorhees and Howrey, Simon, Baker & Murchison, Washington, D. C., of counsel), for intervenor, Business Equipment Manufacturers Assn. (BEMA).
 Herbert E. Marks, Washington, D. C. (Stephen R. Bell and Wilkinson, Cragun & Barker, Washington, D. C., of counsel), for intervenor, CTSS of Assn. of Data Processing Service Organizations, Inc. (ADAPSO).
 Thomas J. O'Reilly, Washington, D. C. (William C. Blethen and Blethen, Ogle, Gage & Krause, Mankato, Minn., of counsel), for intervenors, United States Independent Telephone Ass'n (USITA) and Mankato Citizens Telephone Co., and others.
 Before MOORE, HAYS and MULLIGAN, Circuit Judges.
 MULLIGAN, Circuit Judge:
 
 
 1
 In these consolidated cases,[1] petitioners seek a review of a Final Decision and Order (28 F.C.C.2d 267 (1971)) of the Federal Communications Commission which promulgated certain rules (47 C.F.R. Sec. 64.702 (Supp.1972)) relating to the rendition of computer data processing services by communications common carriers.[2] The petitioners include several telephone companies participating in the data processing field. They challenge the regulations broadly urging that the Commission lacked authority, abused its discretion and failed to follow a proper procedure in establishing the rules. Jurisdiction of this court to review the order is provided by 47 U.S.C. Sec. 402(a) (1970) and 28 U.S.C. Secs. 2342(1), 2343, 2344 (1970).
 
 
 2
 The rules essentially prescribe the conditions under which common carriers, subject to the Communications Act, may engage in the offering of data processing services to others.[3] Since this is the Commission's initial venture into a broad field of new technology and services, some background discussion is appropriate.
 
 I. FACTUAL BACKGROUND
 
 3
 The present day computer is created by the integration of mechanical devices and electronic circuits, and may be programmed to perform a wide variety of complex functions. Modern advancement in the industry built around this controversial machine has been so rapid, both in terms of technology and utilization, that the first commercially available general purpose computer, the UNIVAC, initially employed by the Census Bureau in 1951, has been reposing in the Smithsonian Institute since 1964 along with the Spirit of St. Louis. This advancement has been characterized not only by the continual development of computers having greater capability and efficiency of operation, but also by ever "larger" (higher capacity) computers. Economics of scale has been a major factor in spawning the trend towards the high capacity machine. Capacity of large computers varies with the square of their prices; thus, for double the price one obtains four times the power.
 
 
 4
 The availability and economics of these large computers have in turn contributed significantly to the development of the data processing service industry, as is illustrated by the emergence of several important types of computer service enterprises. A number of major computer manufacturers maintain computer service bureaus, which sell computer time. There are also hundreds of non-manufacturing firms which offer a wide range of data processing services. Moreover, many large institutions, who either own or lease "in-house" computers for their own use, have found it economically desirable to procure surplus computer capacity and to sell the excess to others.
 
 
 5
 Computer services available to the consumer, while taking many and varied forms, may be generally categorized as (1) message-switching; (2) data processing; or (3) a combination of both, i.e., a hybrid service.[4] Message-switching essentially involves the sending of a message by a device, e.g., a teletypewriter, through common carrier lines to a computer where it is stored until an appropriate line is available for forwarding the message to the receiving station; the content of the message remains unaltered.
 
 
 6
 Data processing, the use of the computer for operations which include the storing, retrieving, sorting, merging, and calculating of data, may be offered either as a "local" or a "remote access" service. A local data processing service is one wherein communications facilities are not employed in serving the customer. Input and output of the computer must of course be transmitted between the computer installation and the customer but the customer is in no way "linked" to the computer by communications facilities. Remote access service, on the other hand, provides for direct access to a central computer by customers at distant locations. It is effected by a system including a customer terminal joined to the central computer by common carrier operated communications lines. Where remote access data processing is combined with message-switching in such a way that a single integrated service is offered, it is known as a hybrid service.
 
 
 7
 Telephone companies, like many other organizations, have found important uses for the computer. It is employed directly in the provision of communications services, as well as for billing, accounting and other data processing. Because the nature of the telephone business necessitates the use of large communications computers to handle peak periods of traffic, the considerable excess capacity existing in off-peak hours can be utilized to perform data processing functions. Likewise, surplus computer time may be available on those "in-house" machines generally used to satisfy a telephone company's data processing needs.
 
 
 8
 The marketability of this excess computer capacity, and the growing interaction of the computer and communications industries have attracted common carriers to the computer service field. This in turn has aroused the concern of the FCC. The Commission's response, on November 10, 1966, was to issue a Notice of Inquiry (7 F.C.C.2d 11) and a Supplemental Notice of Inquiry (7 F.C.C.2d 19) on March 2, 1967 which initiated a general investigation into the interdependence of computer and communication services. These inquiries prompted about 3000 pages of comments from sixty interested parties including trade associations, government agencies, professional organizations, communications common carriers, computer manufacturers, computer service organizations, and computer users.
 
 
 9
 The FCC, feeling constrained by its limited internal resources, contracted with the Stanford Research Institute to examine the responses and to make recommendations. After Stanford completed its analysis in a series of seven reports, the Commission released a Report and Further Notice of Inquiry (17 F.C.C.2d 587) on May 9, 1969, seeking comments on the Stanford study. Subsequently, on April 3, 1970, the Commission issued a Tentative Decision (28 F.C.C.2d 291). In addition to setting forth proposed rules, the decision indicated that two basic policy questions remained to be resolved:
 
 
 10
 (a) The nature and extent of the regulatory jurisdiction to be applied to data processing services; and
 
 
 11
 (b) Whether, under what circumstances, and subject to what conditions or safeguards, common carriers should be permitted to engage in data processing.
 
 
 12
 28 F.C.C.2d at 295.
 
 
 13
 Furthermore, the decision indicated that any regulatory safeguard should seek to assure:
 
 
 14
 (a) that [the sale by common carriers of data processing] services will not adversely affect the provision of efficient and economic common carrier services; (b) that the costs related to the furnishing of such services will not be passed on, directly or indirectly, to the users of common carrier services; (c) that revenues derived from common carrier services will not be used to subsidize any data processing services; and (d) that the furnishing of such services will not inhibit free and fair competition between communication common carriers and data processing companies or otherwise involve practices contrary to the policies and prohibitions of the antitrust laws.
 
 
 15
 28 F.C.C.2d at 302.
 
 
 16
 The Commission, after hearing argument on September 3, 1970, filed its Final Decision and Order (28 F.C.C.2d 267) on March 18, 1971. That decision adopted the Tentative Decision and the proposed rules with certain significant additions by a vote of 4 to 3; Chairman Burch and Commissioners Lee and Wells dissented in part.[5] A Memorandum Opinion and Order, denying petitions for reconsideration and affirming (3-2) the Final Decision and Order (34 F.C.C.2d 557) was released on March 30, 1972.
 
 II. THE RULES
 
 17
 The Commission found that there was a "close and intimate relationship" between data processing and communications services; data processing development increasingly depends upon the use of communications services, and communication systems rely upon increasingly greater use of data processing. 28 F.C.C.2d at 269. Having found the close and mutual relationship between common carriers and data processing, the Commission's basic concern has been that the statutory obligation of the communication common carrier to provide adequate and reasonable services could be adversely affected by their also providing data processing services. " 'The dangers . . . relate primarily to the alleged ability of common carriers to favor their own data processing activities by discriminatory services, cross subsidization, improper pricing of common carrier services, and related anti-competitive practices and activities."' 28 F.C.C.2d at 270 (quoting the Tentative Decision, 28 F.C.C.2d at 301-02).
 
 
 18
 The Commission concluded that the best method of regulation was to avoid the extremes of an absolute prohibition of communication common carriers' furnishing computer services, directly or indirectly, and the regulation of the data processing industry as such. The middle ground found by the Commission was based upon the concept of achieving "'a maximum separation of activities which are subject to regulation from non-regulated activities involving data processing."' 28 F.C.C.2d at 269 (quoting the Tentative Decision, 28 F.C.C.2d at 302).
 
 
 19
 a) Rules 47 C.F.R. Secs. 64.702(b), (c)(1), (2), (3) & (d) (Supp.1972)
 
 
 20
 To achieve "maximum separation," the Commission in its Tentative Draft and its present Final Draft promulgated rules 64.702(b), (c)(1), (2) & (3).[6] In substance these regulations provide that no common carrier subject to the Communications Act, in whole or in part,[7] shall furnish data processing services to others except through a separate corporate entity which must maintain its own books of account, have separate officers, employ separate operating personnel, and utilize separate computing equipment and facilities. All contracts, agreements and arrangements between the carrier and such separate corporation, must be filed with the Commission within thirty days. The carrier is further precluded from selling or promoting the data processing services of the separate corporation. Rule 64.702(d)[8] (not in the Tentative Draft) prohibits a carrier from selling or leasing to any other entity any excess capacity or computer system component, which the carrier uses in any way for the provision of its common carrier communications services.
 
 
 21
 We treat these rules separately since their validity rests upon a common legal and factual basis not present in the case of the other rules to be later considered.
 
 
 22
 The initial question raised by certain petitioners is whether the Federal Communications Commission is authorized by Congress to promulgate rules regulating the entrance of communications common carriers into the nonregulated field of data processing services. We think that the answer here has to be in the affirmative. The Commission was created, inter alia, "[f]or the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges . . . ." 47 U.S.C. Sec. 151 (1970).
 
 
 23
 Moreover, the Commission may "make such rules and regulations, and issue such orders . . . as may be necessary in the execution of its functions." 47 U.S.C. Sec. 154(i) (1970). The rules we are now considering are generically based upon the primary charge of the Commission that its carriers provide efficient and economic service to the public. The burgeoning data processing activities of the common carriers pose, in the view of the Commission, a threat to efficient public communications services at reasonable prices and hence regulation is justified under its broad rule-making authority.
 
 
 24
 The fact that the Communications Act makes no reference to computers and data processing is not surprising. The Act was passed in 1934 and although there may have been academic concepts of the computer at that time, its commercial exploitation and impact on regulated communications carriers was certainly not evident. The courts, however, have uniformly and consistently interpreted the Act to give the Commission broad and comprehensive rule-making authority in the new and dynamic field of electronic communication.
 
 
 25
 Thus, although the Act did not provide explicitly that the Commission deal with network practices found inimical to the public interest, the Supreme Court in NBC v. United States, 319 U.S. 190, 219, 63 S.Ct. 997, 1010, 87 L.Ed. 1344 (1943), observed:
 
 
 26
 But Congress was acting in a field of regulation which was both new and dynamic. "Congress moved under the spur of a widespread fear that in the absence of governmental control the public interest might be subordinated to monopolistic domination in the broadcasting field." . . . In the context of the developing problems to which it was directed, the Act gave the Commission not niggardly but expansive powers. (citation omitted).
 
 
 27
 See also United States v. Storer Broadcasting Co., 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956).
 
 
 28
 Similarly, although the Act makes no mention of Community Antenna Television (CATV), the broad power of the Commission to regulate communications was found to encompass the regulation of this technological development. United States v. Southwestern Cable Co., 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968). Our own court has upheld the authority of the Commission to regulate prime time access in television communication despite the absence of any explicit authority in the Act. Mt. Mansfield Television, Inc. v. FCC, 442 F.2d 470, 480-481 (1971).
 
 
 29
 While these cases do not deal with the precise issue here under consideration, they nevertheless point the direction that must be followed in interpreting the Commission's authority under the Communications Act. The plain implication of these precedents is that, even absent explicit reference in the statute, the expansive power of the Commission in the electronic communications field includes the jurisdictional authority to regulate carrier activities in an area as intimately related to the communications industry as that of computer services, where such activities may substantially affect the efficient provision of reasonably priced communications service. We so hold.
 
 
 30
 Another argument levelled by the petitioners is that the findings of the Commission only indicate potential abuse and that the proper role of the FCC should be to wait for actual abuses and then proceed on an adjudicatory basis rather than through the device of rule-making.[9] This argument is not persuasive.
 
 
 31
 [T]he choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency. SEC v. Chenery Corp., 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947).
 
 This court has already pointed out:
 
 32
 It is irrelevant that the rule is aimed at potential rather than actual domination or restraints, or that the Commission is not certain that the developments forecast will occur if the rule is not enacted. Mt. Mansfield Television, Inc. v. FCC, 442 F.2d 470, 487 (1971).
 
 
 33
 It must be emphasized that here the Commission is moving into a new area of policy affecting large numbers of telephone carriers. The advantages of rule-making over adjudicatory proceedings in such circumstances are well understood. K. Davis, Administrative Law Treatise Sec. 6.15 (1970 Supp.); H. Friendly, Benchmarks 143-48 (1967).
 
 
 34
 Finding that the Commission has authority and that rule-making is the appropriate procedure, we have no doubt but that these rules are supported by adequate rational considerations. The Commission has avoided here the extreme of totally barring the carrier from data processing directly or indirectly on the one hand, and the regulation of the data processing industry on the other.[10] The media via approach of "maximum separation" of services is logically directed at eliminating the potential hazards to efficient and economical phone service which is clearly the Commission's primary responsibility and interest here. Specifically, the Commission was concerned that data processing costs would be passed on directly or indirectly to the public consumer of telephone services and that revenues derived from common carrier services would be used to subsidize data processing services. This concern is met by rules 64.702(b), (c)(1), (2) & (3) which mandate the establishment of a separate corporate affiliate, require the filing of intra-organizational agreements, and prohibit the carrier's sale or promotion of its affiliate's data processing services. These rules effectively reduce the possibility of shifting costs, hiding operating or advertising expenses or any juggling of accounts which might otherwise occur. The efficiency of carrier service presumably is maintained and secured by the corporate, physical and financial separation prescribed by the regulation.
 
 
 35
 Rule 64.702(d), although not in the tentative rules, is clearly within the "maximum separation" approach of the Commission. Its prohibition against the leasing or selling of extra capacity or computer system components is aimed at the protection of efficient telephone service to the public by eliminating the possibility of a diversion of facilities to other purposes.[11] In sum, we find these rules fully within the authority of the Commission and amply supported by findings after appropriate rule-making procedure.
 
 
 36
 b) Rules 47 C.F.R. Secs. 64.702(c)(4) & (5) (Supp.1972)
 
 
 37
 The principal attack of the petitioners is levelled against these two rules[12] which in essence preclude the common carriers from purchasing, leasing or otherwise obtaining any data processing service or services from their separate corporations. Further the carrier is prohibited from permitting the separate corporation to employ in its name, any words or symbols contained in the name of the carrier or from using the carrier's name in the separate corporation's promotional enterprise. Although the regulations grammatically prohibit the regulated carrier from dealing with the affiliate or from permitting its name to be used and thus nominally are limited to common carriers, realistically the rules prohibit the data processing affiliate from dealing with the carrier or using its name or symbol. It is urged by the petitioners that these regulations are without statutory authority and constitute an abuse of discretion.
 
 
 38
 While the rules which we have already found valid in Part II(a) of this opinion are supported by the Commission's concern that its regulated carriers continue to provide the public with efficient and economic telephone service, its major reliance here is avowedly upon anti-trust considerations. Since the telephone carrier admittedly has a monopolistic, albeit legal leverage, the Commission is concerned about the threat of an extension of this power into the data processing market. Its concern here therefore is not for the communications market which Congress has entrusted to its care, but for data processing which is beyond its charge and which the Commission itself has announced it declines to regulate.[13] We find the intrusion to be without authority either in the Communications Act or in the cases construing it.
 
 
 39
 The Commission argues that since it has jurisdiction over the telephone carrier, it can bar the data processing affiliate from dealing with the carrier because corporate entities may be disregarded where "they are made the implement for avoiding a clear legislative purpose." Schenley Distillers Corp. v. United States, 326 U.S. 432, 437, 66 S.Ct. 247, 90 L.Ed. 181 (1946). While this is dictum[14] we have no doubt but that it represents a proper statement of the law. However, the proposition has no application at all to the situation at issue. The separate corporate entity is not a device utilized by the carrier to avoid regulation; it has been authorized by the Commission which in these very rules pronounces it as the only legitimate means by which a carrier may provide data processing services to others. While courts have long since engaged in the pursuit of piercing corporate veils where they have been utilized to evade or circumvent legislative enactments, the Commission itself has not only appointed and anointed the separate data processing affiliate but cut the umbilical cord to the parent by the "maximum separation" provisions we have previously discussed. The Commission has no basis at all to now pronounce that the carrier's progeny is really illegitimate and a device to avoid regulation.
 
 
 40
 The Commission argues that it may properly make regulations which are based upon anti-trust considerations. Again we have no quarrel with the proposition of law. However, the unfair competition, restraint of trade or potential threat of monopoly, must be in a market in which the Commission has jurisdiction.[15] The threat here is admittedly to the data processing industry over which the Commission has never asserted jurisdiction and which it has deliberately avoided regulating.[16]
 
 
 41
 The Commission's brief announces that the statutory monopoly power which the telephone company possesses provides a potential leverage into data processing and thus invites anti-trust scrutiny. The cases upon which it relies (see, e. g., United States v. Loew's Inc., 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962); United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948); International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947)) in the main demonstrate that the scrutiny is normally that of the Department of Justice, Anti-Trust Division or the Federal Trade Commission which have responsibility for the enforcement of the Sherman and Clayton Acts.
 
 
 42
 The cases where the Commission has been motivated by anti-trust considerations involve trade regulatory concerns in markets over which the FCC had jurisdiction. Thus in Mansfield Journal Co. v. FCC, 86 U.S.App.D.C. 102, 180 F.2d 28 (1950) the court affirmed the Commission's denial of an application by the Mansfield Journal to construct F.M. and A.M. radio stations in Mansfield, Ohio. The Journal was the only newspaper in town. The FCC's concern was that the monopoly the Journal enjoyed in the newspaper market would spill over into the radio broadcasting field, over which the agency had unquestioned jurisdiction. The concern of the Commission over anti-competitive abuse in communications is of course proper; its concern over data processing services is ultra vires.
 
 
 43
 The CATV cases provide no support for the Commission's assertion of jurisdiction here. In United States v. Southwestern Cable Co., 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968), the authority of the FCC to regulate CATV was based on the need to control the growth of community antenna systems in order that the Commission might accomplish its broad responsibility of orderly development of an appropriate system of local television broadcasting. 392 U.S. at 177, 88 S.Ct. 1994. In short, there was substantial evidence that unregulated CATV would threaten an industry whose growth and development Congress had entrusted to the Commission. There is no claim here that unregulated data processing threatens telephone service to the public.
 
 
 44
 General Tel. Co. v. United States, 449 F.2d 846 (5th Cir. 1971), strongly relied upon by the Commission, is clearly distinguishable in our opinion. That case involved FCC orders prohibiting telephone carriers from furnishing CATV service directly or through affiliates and disallowing the carrier's construction of cable facilities for independent CATV operators except under certain conditions. In view of the prior holding of the Supreme Court in Southwestern Cable, supra, which had emphasized the Commission's plenary responsibility over electrical communication and the continuing and broadening regulation of CATV by the FCC, the decision of the court upholding the orders is hardly surprising. As we have pointed out, the FCC has not claimed jurisdiction to regulate data processing.
 
 
 45
 The General Telephone case, however, is instructive because of the emphasis which the court placed on the FCC's anti-trust jurisdiction. The FCC had found that "[s]ince the telephone companies have a natural monopoly over the means required to conduct a CATV operation, i. e., the poles or conduits, they are in a position to pre-empt the market for this important service. . . . [A]t present CATV is one important gateway to entering the broadband market and it is the Commission's obligation to eliminate any arbitrary blockage of this gateway." 449 F.2d at 856-857. In sharp contrast here, while the FCC found a dependence by the data processing industry upon communications facilities (28 F.C.C.2d at 269), it also found that the computer service industry is one characterized by "open competition" and "relatively free entry"[17] (28 F.C.C.2d at 270). "These characteristics, in fact, provide[d] a major basis for [the Commission's] conclusion that [it] should not, at this point, assert regulatory authority over data processing, as such." 28 F.C.C.2d at 270.
 
 
 46
 The only other consideration we can find in the Final Decision to support the questioned rules is that "[t]he specialized and variant nature of the data processing services, particularly with reference to costs and charges therefor, is conducive to improprieties which are difficult to detect." 28 F.C.C.2d at 273. While the improprieties may be difficult to detect, they should not be difficult to enumerate. We are told only that their net effect "could translate into inflated charges to [communications] customers. . . ." 28 F.C.C.2d at 273. These same improprieties could "cause irreparable harm" to the data processing competitors of the affiliates because of the underpricing possibilities so created. 28 F.C.C.2d at 273. These concerns, in our view, support the "maximum separation" concept of the approved rules but do not sustain the Commission's intrusion into the data processing activities of the separate affiliate.[18] Despite the proclaimed healthy competitive state of the data processing industry, the Commission has indicated that if abuse occurs it will not hesitate to review industry practices. In this posture we see no point to now directing a remand for further study.
 
 
 47
 If we are correct in the view that the Commission has no express or implied authority to regulate the conduct of the data processing subsidiary by reason of anti-trust considerations, thus rendering rule 64.702(c)(5) void as ultra vires, it follows that rule 64.702(c)(4) barring the subsidiary from using the parent carrier's name or symbol or using its name in promotional activities or enterprises, is perforce void. The Commission's "purpose here was to prevent the impairment of effective competition." Brief for FCC at 55. The competition sought to be protected is of course competition in the data processing field which we have repeatedly indicated is not properly within the Commission's purview. Any Commission concern that advertising costs might be commingled and improperly charged to the parent are fully protected by rule 64.702(c)(3) which prohibits a carrier's sale or promotion of its affiliate's data processing services. To characterize rule 64.702(c)(4) as a "logical and necessary extension" of rule 64.702(c)(3) overlooks, of course, the separate legal entity of the data processing affiliate.
 
 
 48
 The Commission reminds us that we are not to be concerned with the wisdom of its regulations nor should we substitute our judgment for that of the Commission as to the prudence of its regulations. We agree. See, e. g., Mt. Mansfield Television, Inc. v. FCC, 442 F.2d 470, 481-482 (2d Cir. 1971). Chairman Burch has made clear in his dissent (28 F.C.C.2d at 289-90) that he believed the disputed rules constitute "a classical case of regulatory over-kill." In his view the prohibition of dealing between parent and subsidiary will preclude the common carrier from revenues which an affiliate through economies of scale or efficiency might be able to offer the parent, even in a competitive bidding setting. He terms the prohibition of the affiliate's use of the parent's name as "naive." These arguments have also been pressed upon us by the petitioners. However, these are considerations properly for the Commission to determine and the majority of its members have determined otherwise. It is no proper part of our judicial function to act as three additional members of that distinguished body. The basis for our decision here is not that we disagree with the prudence or wisdom of the Commission but simply that the Commission had no jurisdiction under its Act or in the cases construing it, to regulate a separate affiliate's business in the data processing market. That is properly the concern of the Anti-Trust Division and the Federal Trade Commission under the Sherman and Clayton Acts if any abuse occurs or is threatened.
 
 III. THE CONNECTING CARRIERS
 
 49
 Several telephone companies have argued that since they are "connecting carriers" within the Act (47 U.S.C. Sec. 152(b)(2) (1970)), they should be exempt from the rules here under consideration. They urge that they are primarily engaged in local exchange telephone service, a communications service exclusively subject to state regulation and expressly exempt from federal supervision (see 47 U.S.C. Secs. 152(b), 221(b) (1970)). The Act (47 U.S.C. Sec. 152(b)(4) (1970)), however, specifically makes applicable to "connecting carriers," i. e., carriers engaged in interstate or foreign communication solely through physical connection with licensed carriers, the provisions of sections 201 to 205. These sections generally give the Commission jurisdiction over the connecting carrier's services, charges and practices which are a part of the uninterrupted and indivisible national system of telephone service. Cf. United States v. Southwestern Cable Co., 392 U.S. 157, 169, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968). In view of the Commission's overall responsibility and broadly construed authority to insure adequate and efficient telephone service at reasonable rates, the same considerations which prompted the maximum separation regulations (47 C.F.R. Secs. 64.702(b), (c)(1), (2), (3) & (d)) which we have found properly within the authority of the Commission with respect to its licensees should govern here. The connecting carriers are indisputably a necessary part of the national telephone network. See General Tel. Co. of Cal. v. FCC, 134 U.S.App.D.C. 116, 413 F.2d 390, 402, cert. denied, 396 U.S. 888, 90 S.Ct. 173, 24 L.Ed.2d 163 (1969). The de minimis argument of the connecting carriers is answered in part at least by the exemption of those connecting carriers whose annual revenues do not exceed $1,000,000 (see note 7 supra).
 
 
 50
 The argument made by the connecting carriers that their data processing subsidiaries are local and in any event do not constitute interstate communications so as to be within the jurisdiction of the FCC is persuasive but is now academic in view of our voiding 47 C.F.R. Secs. 64.702(c)(4) & (5). To the extent that such non-communication and intra-state service poses a threat to efficient interstate telephone service at reasonable rates, the "maximum separation provisions" of the regulations already approved in Part II(a) of this opinion should a fortiori provide public protection. The fact that no actual abuse has been shown as we have already indicated does not oust the Commission of its rule-making role.
 
 
 51
 In summary, we hold that rules 64.702(b), (c)(1), (2), (3) & (d) are valid, but that rules 64.702(c)(4) & (5) are beyond the jurisdictional authority of the Federal Communications Commission.
 
 
 
 [1]
 In Case No 71-1484 petitions for review were filed in the United States Court of Appeals for the Eighth Circuit by telephone companies known collectively as the United Telephone System, and by United Computing Systems, Inc., subsidiaries of United Utilities, Inc. The case was transferred to this court and consolidated with Case No. 71-1300. Petitions to review were filed in Case No. 71-1300 by GTE Service Corp. and GTE Data Services, Inc., subsidiaries of General Telephone & Electronics Corp. Western Union Telegraph Co. filed the petition to review in Case No. 72-1486 which was also consolidated. Case No. 72-1578 was filed by Continental Telephone Co. in the Fourth Circuit, transferred to this Court and consolidated. International Telephone and Telegraph Corp. instituted Case No. 72-1566
 A number of intervenors have also presented arguments in these proceedings. They include: Computer Time-Sharing Services Section (CTSS) of the Association of Data Processing Service Organizations (ADAPSO); Business Equipment Manufacturers Association (BEMA); United States Independent Telephone Association (USITA); and Mankato Citizens Telephone Co.
 
 
 [2]
 By order dated June 7, 1971, this Court stayed the effective date of the regulation pending judicial review
 
 
 [3]
 The Final Decision also established rules regarding the offering of a "hybrid service" (47 C.F.R. Secs. 64.702(e)-(f)) and the termination of a communication service (47 C.F.R. Sec. 64.702(g)). For the definition of "hybrid service" see note 4 infra. These rules have not been challenged and therefore will not be discussed further
 
 
 [4]
 These terms, among others, have been defined in 47 C.F.R. Sec. 64.702(a) (Supp. 1972):
 (1) "Data processing" is the use of a computer for the processing of information as distinguished from circuit or message-switching. "Processing" involves the use of the computer for operations which include, inter alia, the functions of storing, retrieving, sorting, merging and calculating data, according to programmed instructions.
 (2) "Message-switching" is the computer-controlled transmission of messages, between two or more points, via communications facilities, wherein the content of the message remains unaltered.
 (3) "Local Data Processing Service" is an offering of data processing wherein communications facilities are not involved in serving the customer.
 (4) "Remote Access Data Processing Service" is an offering of data processing wherein communications facilities, linking a central computer to remote customer terminals, provide a vehicle for the transmission of data between such computer and customer terminals.
 (5) "Hybrid Service" is an offering of service which combines Remote Access data processing and message-switching to form a single integrated service.
 (i) Hybrid Data Processing Service is a hybrid service offering wherein the message-switching capability is incidental to the data processing function or purpose.
 (ii) Hybrid Communication Service is a hybrid service offering wherein the data processing capability is incidental to the message-switching function or purpose.
 None of the parties to this proceeding have raised any question relating to these definitions.
 
 
 [5]
 Commissioner Bartley concurred in the Final Decision but would have gone further and required "a complete separation of companies making public offerings of regulated common carrier communication services and non-regulated data processing services." 28 F.C.C.2d at 290
 
 
 [6]
 Rules 47 C.F.R. Secs. 64.702(b), (c)(1), (2) & (3) (Supp.1972) provide:
 (b) Except as provided herein, no common carrier subject, in whole or in part, to the Communications Act shall engage directly or indirectly in furnishing data processing service to others except as expressly provided in paragraph (c) of this section. This prohibition shall apply to all communications common carriers, including Section 2(b)(2) carriers, where any carrier itself has annual operating revenues exceeding $1,000,000 or any such carrier is directly or indirectly controlled by, or is under common control with, another carrier or carriers, and the combined annual revenues of all such carriers exceed $1,000,000.
 (c) Except for Companies of the Bell System, common carriers may, subject to other provisions of law, have a controlling or lesser interest in, or be under common control with, a separate corporate entity that furnishes data processing service to others provided the following conditions are met:
 (1) Each such separate corporation must maintain its own books of account, have separate officers, utilize separate operating personnel, and utilize computing equipment and facilities separate from those of the carrier for its data processing service offerings.
 (2) Each such common carrier shall file with the Commission a complete statement of the terms and conditions of every written or oral contract, agreement or other arrangement entered into between such carrier and any such separate corporation within thirty days after the contract, agreement or other arrangement is made.
 (3) No such common carrier subject to the prohibition of paragraph (b) of this section shall engage in the sale or promotion of data processing services on behalf of any such separate corporation.
 
 
 [7]
 A carrier whose annual operating revenue does not exceed $1,000,000 is exempt from the provisions of 47 C.F.R. Secs. 64.702(b) & (c), unless it is, directly or indirectly, controlled by or under common control with another carrier or carriers and their combined annual revenues exceed $1,000,000. See 47 C.F.R. Sec. 64.702 (b)
 American Telephone and Telegraph Company and its affiliated companies (the Bell System) are subject to a consent judgment (United States v. Western Elec. Co., 1956 Trade Cas. p 71,134 (D.N.J.1956)), which, with exceptions not applicable here, prohibit AT&T and its affiliates from engaging in any business other than the furnishing of regulated common carrier services. Thus, in view of the FCC's disclaimer of the regulation of the sale of data processing services (see note 10 infra), the companies of the Bell System are precluded from offering data processing services to others (see 47 C.F.R. Secs. 64.702(b)-(c)).
 
 
 [8]
 Regulation 47 C.F.R. Sec. 64.702(d) (Supp. 1972) provides:
 (d) No common carrier subject in whole or in part to the Communications Act of 1934, as amended, shall sell, lease or otherwise make available to any other entity any capacity or computer system component on its computer system or systems which that carrier uses in any way for the provision of its common carrier communications services.
 
 
 [9]
 Several of the petitioners have urged that rule-making here is implicitly foreclosed by 47 U.S.C. Sec. 215 (1970) which directs the Commission to examine into carrier activities and transactions likely to adversely affect the ability of a carrier to render adequate service to the public and to report any findings to Congress along with recommended corrective legislation. We do not agree. In view of the Commission's broad responsibilities, we cannot believe that Congress intended by this section to preclude rule-making in the area of the Commission's prime concern-adequate public communications service. Had Congress wished to impose such a limitation on its expansive grant of power to the Commission, we think it would have done so explicitly. We refuse to impose the limitation. See General Tel. Co. v. United States, 449 F.2d 846, 858 (5th Cir. 1971)
 
 
 [10]
 The Commission stated in its Final Decision: "Since we are not proposing, at this time, to regulate data processing, as such, a discussion of the extent of our jurisdiction with respect thereto is neither relevant nor necessary . . . ." 28 F.C.C.2d at 268. It further indicated that "'[i]f there should develop significant changes in the structure of the data processing industry, or, if abuses emerge which require the exercise of corrective action by the Commission, we shall not hesitate to re-examine the policies set forth herein.' " Id. (reiterating position set forth in the Tentative Decision, 28 F.C.C.2d at 298)
 
 
 [11]
 The petitioners have raised some question as to how broadly 47 C.F.R. Sec. 64.702(d) is to be interpreted. Is it to be construed to prohibit the use of all computer systems employed by the carrier no matter whether used for internal purposes or for communications or is it to be interpreted more narrowly? See Brief for GTE Service Corp. at 4 n. 3; Brief for Continental Telephone Corp. at 13 n. 5; Brief for United Telephone System at 13 n. 16; Brief for FCC at 54 n. 35. We believe that it is not necessary for us to pass on this question. Properly the interpretation of the regulation is for the Commission in the first instance. In our view the Commission has in any event the plenary power to bar the use of all carrier computer systems
 
 
 [12]
 Rules 47 C.F.R. Secs. 64.702(c)(4) & (5) (Supp.1972) provide:
 (4) No such common carrier, or a holding company owning or jointly owning a common carrier and any such separate corporation, shall permit the separate corporation to employ in its name any words or symbols contained in the name of the carrier, nor shall such carrier or holding company permit any such separate corporation to use the name of the carrier in the separate corporation's promotional activities or enterprises.
 (5) No such common carrier shall purchase, lease or otherwise obtain any data processing service or services from any such separate corporation.
 
 
 [13]
 See note 10 supra
 
 
 [14]
 The actual holding of the Court was a refusal to treat the corporate parent and affiliate as a single entity. In the antitrust field, since section 1 of the Sherman Act (15 U.S.C. Sec. 1 (1970)) requires a contract, combination or conspiracy in restraint of trade, courts have carefully respected the separate corporate identity of parent and subsidiary in order to come within the multiparty requirement of the statute. See Timken Roller Bearing Co. v. United States, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951); Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951). Curiously antitrust violators are more apt to be snared by the judicial recognition of a separate corporate affiliate than by ignoring it
 
 
 [15]
 The statutory authority relied upon by the Commission to justify its anti-trust concerns confirm the position that the anti-competitive threats must be to a market in which the Commission has jurisdiction. Thus, 47 U.S.C. Sec. 201(b) (1970) provides: "All charges, practices, classifications, and regulations for and in connection with . . . communication service, shall be just and reasonable . . . ." (emphasis added). Section 202(a) provides: "It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly . . . ." (emphasis added). Section 205(a) again simply authorizes the Commission to prescribe just, fair and reasonable charges, regulations and practices for a carrier
 
 
 [16]
 This factual situation contrasts with that in the CATV cases where the FCC repeatedly urged regulation over an ancillary communications industry which threatened to interfere with television broadcasting. See United States v. Southwestern Cable Co., 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968)
 
 
 [17]
 " 'For a relatively small capital investment, a service firm can be formed, computer equipment can be leased, and programmers can be hired. The factors which mark the difference between service bureau success or failure are imaginative innovation, quality programming, and useful service features, rather than the size of the staff or the computing installation."' 28 F.C.C.2d at 272 (quoting the Tentative Decision, 28 F.C.C.2d at 297-98)
 
 
 [18]
 See generally SEC v. Chenery Corp., 318 U.S. 80, 95, 63 S.Ct. 454, 87 L.Ed. 626 (1943); Friendly, Chenery Revisited: Reflections on Reversal and Remand of Administrative Orders, 1969 Duke L.J. 199, 209-17